Ayodeji O. **DEMUREN**, Moustafa R. Moustafa, Duc Thai Nguyen, and Ramamurthy Prabhakaran, Plaintiffs,

v.

**OLD DOMINION UNIVERSITY**, Ernest J. Cross, Jr., William Stanley, Jo Ann Gora, William A. Drewry, and Robert L. Ash, Defendants.

No. 2:98cv479.

United States District Court, E.D. Virginia, Norfolk Division.

Jan. 12, 1999.

Thomas F. Hennessy, III, SuAnne L. Bryant, Hardee & Hennessy, P.C., Chesapeake, VA, for plaintiffs.

Guy Winston Horsley, Jr., Margaret Alice Browne, Office of the Attorney General, Richmond, VA, Patrick Brian Kelly, Special Assistant Attorney General, Norfolk, VA, for defendants.

## MEMORANDUM OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This case is before the court on defendants' motion for summary judgment. For the reasons stated below, defendants' motion is **GRANTED**.

### I. Factual and Procedural History

The four plaintiffs, all university professors, filed a Motion for Judgment in the Circuit Court for the City of Norfolk on April 9, 1998. The six defendants are: Old Dominion University ("ODU"); Jo Ann Gora, Provost of ODU since 1992; Ernest J. Cross, Dean of the College of Engineering at ODU from 1984 to 1996; William Stanley, Chair of the Engineering Technology Department since 1991; William Drewry, Chair of the Civil and Environmental Engineering Department from 1992 to 1997; and Robert Ash, Chair of the Department of Mechanical Engineering from 1984 to 1993. Each plaintiff states a claim against ODU, Dean Cross, and Provost Gora, as well as his specific department chair.

The four plaintiffs and their claims are as follows:

1. Ayodeji Demuren, who is of Nigerian descent, is a tenured Full Professor in the Mechanical Engineering Department. He claims that because of his national origin and in retaliation for his participation in protected activity, he was denied promotion to Full Professor in 1994 and 1995,[1] and his salary is below that of similarly-situated Caucasian professors.

2. Moustafa Moustafa, who is of Egyptian descent, is a tenured Associate Professor in the Engineering Technology Department. He claims that because of his national origin, his salary increases since 1992 have been below those of similarly-situated Caucasian professors with inferior records of achievement.[2]

3. Duc Thai Nguyen, who is of Vietnamese descent, is a tenured Full Professor in the Civil and Environmental Engineering Department. He claims that because of his national origin, his salary and salary increases are lower than similarly-situated Caucasian professors, despite his allegedly outstanding professional record.[3]

4. Ramamurthy Prabhakaran, who is of Indian descent, is a tenured Full Professor in the Mechanical Engineering Department. He alleges that because of his national origin and in retaliation for his participation in protected activity: 1) his salary is unfairly low; 2) he was excluded from the College's Dean Search Committee; 3) he was denied the 1996 University Outstanding Research Award; and 4) he was denied Eminent Scholar status.

Plaintiffs allege that defendant ODU's actions, with respect to each of them, violated:

---

1. Demuren was promoted to Full Professor in 1996.

2. In plaintiffs' original complaint, Moustafa also alleged discrimination in the provision of resources and equal opportunities, namely that the University administration unfairly delayed Moustafa's receipt of a laptop computer and funding for his sabbatical. However, during the hearing on defendants' motion for summary judgment, plaintiffs' attorney indicated that Moustafa does not wish to pursue this claim, but rather he merely seeks recovery for his allegedly discriminatory compensation.

3. In his affidavit, Nguyen also complained about his failure to receive an early promotion in 1994 and 1995. This allegation did not appear in plaintiffs' complaint, and Nguyen did not raise it in his EEOC charge, either. During the hearing on defendants' motion for summary judgment, plaintiffs' attorney indicated that Nguyen does not wish to pursue this claim, but rather he merely seeks recovery for his allegedly discriminatory compensation.

1) Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2; 2) 42 U.S.C. § 1981; and 3) 42 U.S.C. § 1983.[4] They claim that the actions of the individual defendants violated § 1981 and § 1983.

Defendants filed a notice of removal to federal court on April 29, 1998. On August 31, 1998, defendants filed a motion for summary judgment. On September 14, 1998, plaintiffs responded to defendants' motion, and defendants filed a reply on September 21, 1998. The court held a hearing on defendants' motion on October 14, 1998. Accordingly, defendants' motion is ripe for decision.

## II. Standard of Review

 Summary judgment is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting a motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 322–24, 106 S.Ct. 2548. Such facts must be presented in the form of exhibits and sworn affidavits. A mere "scintilla of evidence" is not sufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In a discrimination case, a court must take special care when considering a summary judgment motion because motive is often the critical issue. However, summary judgment is still appropriate if the plaintiff cannot prevail as a matter of law. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.1996).

## III. Analysis

In their motion for summary judgment, defendants not only challenge the merit of plaintiffs' case, but also claim to be immune from suit under 42 U.S.C. § 1981 and § 1983, and argue that most of plaintiffs' claims are untimely.

### A. Defendants' Immunity from Suit Under § 1981 and § 1983

 The Eleventh Amendment to the United States Constitution prohibits suits against state actors by individuals in federal court, absent consent or Congressional abrogation. U.S. Const. amend XI; *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Supreme Court has recognized Congressional abrogation of Eleventh Amendment immunity for suits under Title VII, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), but not for suits under 42 U.S.C. § 1983, *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). With respect to suits under 42 U.S.C. § 1981, this court concurs with the view held by a number of other federal courts that Eleventh Amendment immunity also is not abrogated.[5]

---

4. Title VII outlaws discrimination by an employer "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It also prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

 Section 1981 ensures that all persons "shall have the same right … to make and enforce contracts," 42 U.S.C. § 1981(a), defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b).

 Section 1983 imposes civil liability on any person who, under color of state law, deprives an individual "of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983.

5. *See, e.g., Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1178–79 (6th Cir.1987); *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1181 (7th Cir.1982); *Sessions v. Rusk State Hosp.*, 648

Like § 1983, § 1981 lacks the requisite clear congressional intent to abrogate.[6] Moreover, in *Seminole Tribe,* the Supreme Court held that Congress may abrogate Eleventh Amendment immunity only for causes· of action created pursuant to § 5 of the Fourteenth Amendment. Congress originally passed § 1981 pursuant to the Thirteenth Amendment. *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 422–437, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (describing the legislative history of the Civil Rights Act of 1866, a portion of which is now § 1981). In light of the absence of Congressional abrogation of immunity, and since there is no evidence of consent in this case, defendants are immune from suit under both § 1981 and § 1983, if they qualify as state actors under the Eleventh Amendment.

■ With respect to defendant ODU, a number of circuits have ruled that state colleges and universities are agents of the state, and thus immune from suit under the Eleventh Amendment. *Brine v. University of Iowa,* 90 F.3d 271, 275 (8th Cir.), *cert. denied,* 519 U.S.· 1149, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997); *Watson v. University of Utah Med. Ctr.,* 75 F.3d 569, 575 (10th Cir. 1996); *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470, 491 (3d Cir.) In accordance with these decisions, this court holds that ODU is immune from suit under 42 U.S.C. § 1981 and § 1983. Thus, the only statutory basis under which ODU may be held liable to plaintiffs is Title VII.

■ With· respect to the. individual defendants, the Supreme Court has held that the Eleventh Amendment does not bar suits in federal court seeking to impose personal liability on individual state officials. *Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does recognize "qualified immunity" from suits for damages for the actions of government officials that do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In applying *Harlow,* the Fourth Circuit has stated that a key determination is "whether the rights alleged to have been violated were clearly established at the time of the challenged actions." *Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995). "Where the law is clearly established, and where no reasonable [official]· could believe he was acting in accordance with it, qualified immunity will not attach." *Id.*

There is no question that the protections afforded individuals under 42 U.S.C. § 1981 and § 1983 are clearly established. The individual defendants also cannot possibly argue that if they did, in fact, discriminate against plaintiffs on account of their nationality or retaliate against them for their protected activity, they were unaware that such actions violated federal law. Therefore, if plaintiffs' allegations regarding the individual defendants' actions are true, those defendants do

F.2d 1066, 1069 (5th Cir. Unit A June 1981); *Carmen v. San Francisco Unified Sch. Dist.,* 982 F.Supp. 1396, 1403 (N.D.Cal.1997); *Chinn v. City Univ. Sch. of Law at Queens College,* 963 F.Supp. 218, 224 n. 1 (E.D.N.Y.1997); *Tang v. Rhode Island Dep't of Elderly Affairs,* 904 F.Supp. 55, 63 (D.R.I.1995); *Khan v. Maryland,* 903 F.Supp. 881, 888 (D.Md.1995); *Toney v. Alabama,* 784 F.Supp. 1542, 1544–45 (M.D.Ala. 1992); *Baker v. Board of Regents,* 721 F.Supp. 270, 273 (D.Kan.1989); *Davis v. Buffalo Psychiatric Ctr.,* 623 F.Supp. 19, 20 (W.D.N.Y.1985); *Woods v. Missouri Dep't of Mental Health, Kansas City Reg'l Diagnostic Ctr.,* 581 F.Supp. 437, 441 (W.D.Mo.1984).

**6.** Congress's intent to abrogate "must be obvious from 'a clear· legislative statement.' " *Seminole Tribe,* 517 U.S. at 55, 134 L.Ed.2d 252 (quoting *Blatchford v. Native Village of Noatak,* 501 U.S.

775,· 786, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991)). In *Quern,* the Court noted that § 1983 "does not explicitly and by clear language indicate on its face" an intent to abrogate Eleventh Amendment immunity, nor does its history clearly indicate such an intent. *Quern,* 440 U.S. at 345, 99 S.Ct. 1139; *cf. Seminole Tribe,* 517 U.S. at 56–57, 116 S.Ct. 1114 (holding that Congress expressed a clear intent to abrogate in the Indian Gaming Regulatory Act by repeatedly referring to "State" in the text of the Act). The language of § 1981 does not apply to states any more clearly than does the language of § 1983. Moreover, courts exploring the legislative history of § 1981 have found, as with § 1983, no clear indication of a congressional intent to abrogate Eleventh Amendment immunity. *See, e.g., Daisernia v. New York,* 582 F.Supp. 792, 801–03 (N.D.N.Y. 1984).

not enjoy qualified immunity for those actions, and are subject to suit under § 1981 and § 1983.

### B. Timeliness of Plaintiffs' Claims

■ Defendants argue that the applicable statutes of limitations bar plaintiffs' claims under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. A Title VII claim arising in Virginia must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the allegedly discriminatory action, else it is barred.[7] 42 U.S.C. § 2000e–5(e); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 442 (4th Cir.1998). If the EEOC takes no action, the complainant then must file suit within 90 days. 42 U.S.C. § 2000e–5(f). Claims under § 1981 and § 1983 are subject to the state of Virginia's two-year statute of limitations for personal injury claims. Va.Code Ann. § 8.01–243 (Michie 1998) (setting a two-year statute of limitations for personal injury claims); *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (holding that the statute of limitations for § 1983 claims corresponds with the state statute of limitations for personal injury claims); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 275 (4th Cir.1976) (holding that the state statute of limitations for personal injury claims applies to § 1981 claims, as well).

■ Defendants assert that many of the events upon which plaintiffs base their claims occurred outside of the limitations periods described above.[8] Ordinarily, a claim based upon allegedly discriminatory actions occurring outside of the applicable limitations periods is time-barred. However, such actions may form the basis for a timely claim if they are part of a "continuing violation." To qualify as a continuing violation, the Fourth Circuit has stated that the alleged incidents of discrimination must constitute "a series of separate but related acts" such that they are "manifested in a continuing violation." *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir.1980) (per curiam). Moreover, "there must be a 'present violation'" within the statutory period. *Hill v. AT & T Techs., Inc.*, 731 F.2d 175, 180 (4th Cir.1984) (citing *Woodard v. Lehman*, 717 F.2d 909, 914–15 (4th Cir.1983)).

Plaintiffs argue that their discriminatory and retaliatory compensation claims are timely, even though they are based to some extent on allegedly discriminatory salary increases and other events taking place outside of the limitations periods, because discriminatory compensation is a continuing violation. In *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court held that past discriminatory compensation continuing to affect a plaintiff's current salary is actionable. The plaintiffs in *Bazemore* were employees of the North Carolina Agricultural Extension Service. Prior to the passage of the Civil Rights Act of 1964, the Extension Service maintained separate white and black branches. The branches merged in 1965, but some pay disparities between white and black employees remained at the time of the suit. The Extension Service argued that since Title VII did not become applicable to public employers

---

7. Title VII's 300–day statutory limit, as opposed to the 180–day limit, applies to claims arising in Virginia because Virginia has a qualifying "deferral agency"—the Virginia Council on Human Rights. *Tinsley*, 155 F.3d at 442. In actuality, a plaintiff, like each of the plaintiffs in this case, who first files a charge with the EEOC rather than with the Virginia Council on Human Rights, should do so within 240 days of the discriminatory action. Filing within 240 days ensures that, in the event the charge is referred to the Virginia Council on Human Rights and the Council takes the full 60 days available to it to review the charge, *see* 42 U.S.C. § 2000e–5(c), the charge will come back to the EEOC within the 300–day limit. *Tinsley*, 155 F.3d at 439.

8. Plaintiff Demuren filed his EEOC complaint on March 18, 1997, so only those incidents occur-ring after May 22, 1996, may form the basis of his Title VII claim. Plaintiff Moustafa filed his EEOC complaint on January 16, 1998, so only those incidents occurring after March 22, 1997, may form the basis of his Title VII claim. Plaintiff Nguyen filed his EEOC complaint on January 22, 1998, so only those incidents occurring after March 28, 1997, may form the basis of his Title VII claim. Plaintiff Prabhakaran filed his EEOC complaint on May 30, 1997, so only those incidents occurring after August 3, 1996, may form the basis of his Title VII claim. All four plaintiffs filed their joint complaint on April 9, 1998, so only those incidents occurring after April 9, 1996, may form the basis of their § 1981 and § 1983 claims.

until 1972, and since it stopped segregating employees in 1965, plaintiffs failed to state an actionable claim. The Court rejected the Service's argument. It held that "[w]hile recovery may not be permitted for pre–1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed." *Bazemore,* 478 U.S. at 395, 106 S.Ct. 3000. The Court explained that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.* at 395–96, 106 S.Ct. 3000.

The Fourth Circuit applied the *Bazemore* holding in *Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336 (4th Cir.1994), a gender discrimination case. The defendant in *Brinkley–Obu* argued that the last act of discrimination alleged by the plaintiff occurred outside of the limitations period, and that the plaintiff's low salary was simply a continuing effect of that past discrimination. The Fourth Circuit, relying on *Bazemore,* rejected the defendant's argument and held that the plaintiff's discriminatory compensation was a continuing violation. *Id.* at 346–47.

*Bazemore* and *Brinkley–Obu* involved claims under only Title VII. However, The Fourth Circuit has applied the continuing violation doctrine to § 1981 claims as well. *Williams v. Norfolk & W.,* 530 F.2d 539 (4th Cir.1975). While *Williams* did not expressly extend the continuing violation doctrine to § 1983 claims, it seems only logical that if the doctrine applies to § 1981 claims, it also should apply to § 1983 claims. Therefore, based upon the foregoing authority, discrimi-

natory and retaliatory compensation is a continuing violation for claims brought under Title VII, § 1981, and § 1983. Accordingly, all four plaintiffs' discriminatory and retaliatory compensation claims are timely.

In addition to the plaintiffs' discriminatory compensation claims, plaintiff Prabhakaran's claims that he was unfairly excluded from the Dean Search Committee, that he was unfairly denied Eminent Scholar status in 1997, and that he was unfairly denied the 1996 University Outstanding Research Award are timely because they fall within the applicable limitations periods. However, Prabhakaran's claim that he was unfairly denied Eminent Scholar status in 1990, and plaintiff Demuren's claim that he was unfairly denied promotion in 1994 and 1995 fall outside of the limitations periods for Title VII, § 1981, and § 1983.

 Plaintiffs do not argue that the continuing violation doctrine should apply to Prabhakaran's and Demuren's stale claims. In any event, even if they had advanced such an argument, it lacks merit. The Fourth Circuit has expressly refused to apply the continuing violation doctrine to failure to promote claims when, as with Demuren, every instance of nonpromotion took place outside of the limitations period. *Hill,* 731 F.2d at 179–80; *Woodard,* 717 F.2d at 915–16.[9] As for Prabhakaran's claim regarding his failure to receive Eminent Scholar status in 1990, it is likewise not part of an allegedly continuing violation. In *Williams v. Enterprise Leasing Co.,* 911 F.Supp. 988 (E.D.Va.1995), this court adopted a test originally set out by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State University,* 715 F.2d 971 (5th Cir.1983),[10] for the continuing viola-

---

9. One could argue, although plaintiffs did not do so in this case, that failure to promote is a continuing violation because of the continuing effect that nonpromotion, like past discriminatory compensation, has on a plaintiff's current salary. However, in *Hill* and *Woodard,* the Fourth Circuit implicitly rejected such an argument. Instead, it seemed to adhere to the general rule from *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), that a past discriminatory act is not a continuing violation merely because it has some present effect. The discriminatory act at issue in *Evans* was United Air Lines' discharge of flight attendant Evans in 1969 because she married. United

rehired Evans in 1972, but for seniority purposes, treated her as if she had not worked for United prior to 1972. Evans sued under Title VII, claiming that United's seniority system gave present effect to a past act of discrimination. The Court held that United's seniority system was "neutral in its operation," and that since Evans failed to file a claim within the limitations period after her discharge in 1968, "United was entitled to treat that past act as lawful." *Evans,* 431 U.S. at 558, 97 S.Ct. 1885.

10. A number of other circuits have adopted the *Berry* test, as well. *See West v. Philadelphia Elec.*

tion doctrine. According to the *Berry* test, a court should analyze three factors: 1) whether the alleged acts constitute the same type of discrimination; 2) whether the alleged acts are frequent; and 3) whether the alleged acts "have a degree of permanence which would trigger an employee's awareness and duty to assert his or her rights." *Enterprise Leasing*, 911 F.Supp. at 996. The first two factors amount to a prerequisite that the defendant's alleged actions constituted a pattern or practice of discrimination. *Id.* The third factor requires that the plaintiff lacked notice of the defendant's discriminatory intent such that the plaintiff would not have been expected to have brought a claim in closer proximity to the discriminatory incidents. *Id.*[11]

Based upon the *Berry* test, Prabhakaran's failure to receive Eminent Scholar status in 1990 was not part of a continuing violation. The fact that this incident occurred many years earlier than the other allegedly adverse actions about which Prabhakaran complains undermines the argument that it was part of a pattern and practice of discrimination, as required by the first two *Berry* factors. However, even if the 1990 Eminent Scholar incident is regarded as part of an alleged pattern of discrimination, the third *Berry* factor establishes that it is not part of a continuing violation. Prabhakaran clearly perceived his failure to receive Eminent Scholar status in 1990 as an act of discrimination. Plaintiffs' own complaint reveals that Prabhakaran wrote at least two letters in 1992 to University administrators questioning the decision, and that he complained to Provost Gora at an open faculty meeting in 1993, and again in a meeting with her in 1996, that the action was discriminatory. Thus, Prabhakaran cannot now rely on the continuing violation doctrine to revive his

stale claim that he was unfairly denied Eminent Scholar status in 1990.

In summary, all four plaintiffs' discriminatory and retaliatory compensation claims, as well as Prabhakaran's claims that he was unfairly excluded from the Dean Search Committee, unfairly denied the 1996 University Outstanding Research Award, and unfairly denied Eminent Scholar status in 1997, may go forward. However, Prabhakaran's claim that he was unfairly denied Eminent Scholar status in 1990, and Demuren's claim that he was unfairly denied promotion in 1994 and 1995 are time-barred. The court now turns to the merits of plaintiffs' timely claims.

## C. Merit of Plaintiffs' Claims

■ The burden of proof on a plaintiff in an employment discrimination case is the same for claims under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (applying the standard for Title VII claims to claims under § 1981); *Abasiekong v. City of Shelby,* 744 F.2d 1055, 1058 (4th Cir.1984) (holding that § 1981 and § 1983 claims are reviewed under the same framework as Title VII claims). A plaintiff may satisfy that burden on summary judgment by offering direct evidence of an intent to discriminate, or indirect evidence pursuant to the three-part framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996).

■ Direct evidence of discrimination is either direct evidence of a stated purpose to discriminate, or circumstantial evidence of sufficient probative force to raise a genuine

---

*Co.,* 45 F.3d 744, 755 n. 9 (3d Cir.1995); *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1415 (10th Cir.1993); *Selan v. Kiley,* 969 F.2d 560, 565 (7th Cir.1992); *Sabree v. United Brotherhood of Carpenters and Joiners Local No. 33,* 921 F.2d 396. 401–02 (1st Cir.1990); *Roberts v. Gadsden Mem'l Hosp.,* 835 F.2d 793, 800, *amended on other grounds,* 850 F.2d 1549 (11th Cir. 1988).

11. Defendants rely on the *Berry* test to argue that the continuing violation doctrine should not apply to plaintiffs' discriminatory and retaliatory compensation claims. However, the *Berry* test is not applicable to those claims. According to *Bazemore* and *Brinkley–Obu,* discriminatory compensation is, by definition, a continuing violation, so the court does not need to apply the *Berry* analysis to plaintiffs' discriminatory and retaliatory compensation claims to determine whether the continuing violation doctrine applies.

issue of material fact. *Evans,* 80 F.3d at 959; *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.1988); *cf. Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 240, 242 (4th Cir.1982) (discussing the sufficiency of direct evidence of discrimination in the context of a directed verdict).[12] The plaintiff's "own naked opinion, without more," is not enough to establish a genuine issue of fact. *Goldberg,* 836 F.2d at 848; *see also Evans,* 80 F.3d at 959 (quoting *Goldberg* ).

 Under the *McDonnell Douglas* framework, the burden is on the plaintiff initially to establish a prima facie case of discrimination by presenting some evidence showing a connection between his status as a member of a protected class and an adverse employment action. *Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1385 (4th Cir.1987). Plaintiff's burden is "not onerous." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a prima facie case of discriminatory compensation, a plaintiff must show that, as a member of a protected class, he was paid less than a similarly-situated employee who is not a member of a protected class. *Cf. Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir.1994) (gender discrimination case). For a retaliation claim, a plaintiff must show that 1) he engaged in protected activity, 2) he experienced some adverse action, and 3) there is a causal connection between the adverse action and the protected activity. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for the adverse action. A defendant's explanation must be supported by evidence. Mere allegations in the pleadings or arguments of counsel are insufficient. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089.

 Finally, if the defendant offers a nondiscriminatory explanation, the burden shifts back to the plaintiff to show that the defendant's explanation is a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. The Fourth Circuit requires a plaintiff to meet a "pretext-plus" standard to carry this burden and survive a motion for summary judgment. Under the pretext-plus standard, a plaintiff must do more then simply challenge the truthfulness of the defendant's explanation. Rather, he must offer some evidence that discrimination was the defendant's actual motivation. *Vaughan v. Metrahealth Cos.,* 145 F.3d 197, 202 (4th Cir.1998); *see also Gillins v. Berkeley Elec. Coop., Inc.,* 148 F.3d 413, 417 (4th Cir.1998) (holding that a plaintiff must offer evidence "both that the proffered, nondiscriminatory reason is false and that race discrimination is the 'real reason' " for the differential treatment). In reviewing a university employer's nondiscriminatory explanation, a court should exercise particular care because professorial employment decisions "necessarily involve 'subjective and scholarly judgments.' " *Jiminez v. Mary Washington College,* 57 F.3d 369, 376 (4th Cir.1995).

 All four plaintiffs rely, in part, on evidence that allegedly shows a "pattern and practice" of discrimination at ODU. The Fourth Circuit has stated clearly that non-class action plaintiffs may not assert a pattern and practice claim. *Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 759 (4th Cir.1998) ("[I]ndividuals do not have a private, non-class cause of action for pattern or

---

**12.** Other circuits place stricter requirements on what a plaintiff may introduce as direct evidence of discrimination. The Fifth, Seventh, and Eleventh Circuits all adhere to the rule that to constitute direct evidence of discrimination, the evidence must show the defendant's discriminatory intent without resort to inference or presumption. *Portis v. First Nat'l Bank,* 34 F.3d 325, 328–329 (5th Cir.1994); *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 569 (7th Cir.1989); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir.1982). An example of such evidence is a "statement or written document showing a discriminatory motive on its face." *Portis,* 34 F.3d at 329 (citing *Miles v. M.N.C. Corp.,* 750 F.2d 867, 870 (11th Cir.1985)). In addition, the Seventh and Tenth Circuits require that the evidence relate directly to the adverse action at issue in the plaintiff's claim. *Randle,* 876 F.2d at 569; *Furr v. AT&T Techs., Inc.,* 824 F.2d 1537, 1549 (10th Cir.1987); *see also Hodges v. Stone Savannah River Pulp & Paper Corp.,* 892 F.Supp. 1571, 1577 (S.D.Ga.1995).

practice discrimination under § 1981 or Title VII."). However, plaintiffs may use evidence of a pattern and practice of discrimination to establish a prima facie case pursuant to the *McDonnell Douglas* framework. *Id.* at 760–61. Plaintiffs' pattern and practice evidence consists of two reports: a 1996 Asian/Asian–American Council report examining possible discriminatory treatment of Asian–American professors at ODU; and a September, 1998, report prepared by Dr. Zia Razzaq [13] titled "Status of Foreign Born Asian & Foreign Born African American Engineering Faculty at Old Dominion University."

It is not clear that either of these reports are admissible, since plaintiffs failed to establish that they fall under any hearsay exception. In any event, even if both reports are admissible, they have no value as evidence of discrimination against plaintiffs. The 1996 report concludes that Asian–American faculty in the College of Engineering are treated differently than Caucasian professors with respect to promotion decisions and salary. However, the report fails to account for salary differences due to administrative appointments. Moreover, because the report does not compare Asian–American and Caucasian professors with respect to the same criteria that the College of Engineering uses to determine salaries, it does not establish that allegedly lesser paid professors are similarly-situated to their higher-paid comparators.

The 1998 report is even more suspect. It concludes that the salaries of foreign born Asian– and African–American professors in the College of Engineering are lower than the salaries of Caucasian professors. The report notes that the average period of elapsed time since receiving a Ph.D. was the same for both groups, and it documents a number of other areas in which foreign born Asian- and African–American professors outperformed Caucasian professors, including doctoral degree production, journal paper publication, and teaching quality. However, the report fails to address all of the factors that determine Engineering faculty salaries, including research grant productivity, purchase release time, and University and community service. More significantly, at least two of the faculty included in the report's "Caucasian" category are of foreign descent: Dr. Kandil, who is Egyptian, and Dr. Baysal, who is Indian (Asian). The inclusion of foreign professors in the pool of "Caucasian" professors completely undermines the report's validity.

In addition to their pattern and practice evidence, each plaintiff produces individual evidence to support his own claims. However, as discussed below, this evidence fails to raise a genuine issue of material fact, either directly, or indirectly through the *McDonnell Douglas* framework, with respect to any of plaintiffs' claims.

### 1. Demuren

▮▮▮▮ Plaintiff Demuren's only timely claim is that he received discriminatory and retaliatory compensation.[14] Demuren offers

13. Dr. Razzaq is a professor in the Department of Civil and Environmental Engineering, and a plaintiff in a separate, recently dismissed discrimination suit against ODU. *Razzaq v. Old Dominion Univ., et al.*, No. 2:98cv529 (E.D.Va. Nov. 25, 1998).

14. As discussed above, Demuren's failure to promote claim is untimely. However, even if it were timely, it lacks merit. The only evidence Demuren produces to support a prima facie case of discrimination or retaliation is three letters that he wrote to ODU President James Koch appealing his nonpromotions in 1994 and 1995. In those letters, Demuren compared his record to the professional accomplishments of nine faculty members in the Mechanical Engineering Department at the time that they were promoted to Full Professor. Demuren did not indicate the nationality of any of the nine professors. Ac-

cording to Demuren, he compared favorably to these professors in the areas of teaching, publication productivity, years of experience, diversity of funding sources, total research grant production, average annual grant production, and University service. He further asserted that his record compared favorably to that of a Caucasian Mechanical Engineering professor promoted soon before Demuren. However, Dr. Selby, Chair of the Mechanical Engineering Department, stated in an affidavit filed with the court that Demuren's research productivity in 1994 and 1995 declined significantly from the level of his productivity in previous years, and that a faculty member should have significant sponsored research at the time of promotion. Defendants asserts that the College of Engineering Promotion and Tenure Committee, the University Promotion and Tenure Committee, the Dean of the College, and the University Provost all rec-

no direct evidence to support his claim, but instead relies on indirect evidence, pursuant to the *McDonnell Douglas* framework.

Demuren does not dispute that, as an Associate Professor, he had the second-highest salary in his Department, and that he received the second-highest salary increase each year. After his promotion to Full Professor in 1996, he became the sixth-highest paid professor in his Department out of fifteen. Demuren does note that the merit increase he received in conjunction with his promotion was the lowest in the Department. However, the current Chair of Demuren's Department, Dr. Gregory Selby, explained in his affidavit that Demuren's recent poor publication record accounts for his low merit increase, and Demuren does not challenge Selby's explanation.

Despite his apparently adequate salary, Demuren alleges that his salary is lower than the salaries of similarly-situated Caucasian professors in the College of Engineering. He relies on only one comparator, a "Dr. K," who is a professor in the Aerospace Department. Demuren asserts that Dr. K's salary is higher than his, despite the fact that Dr. K has less seniority, and that the Science Citation Index [15] rates Demuren more favorably. However, Demuren does not dispute that seniority and the Science Citation Index do not carry much weight as salary increase criteria. Moreover, Demuren fails to compare himself to Dr. K or any other ODU faculty member in terms of the criteria that the College of Engineering uses to determine salaries.

Demuren also bases his discriminatory compensation claim on the fact that salaries in the Mechanical Engineering Department are generally lower than salaries in the Aerospace Engineering Department. He alleges that foreign-born faculty were channeled into the Mechanical Engineering Department and

then paid lower salaries. Demuren does not dispute that at the time that the Aerospace Department was created, faculty in the Mechanical Department were given the choice of whether to stay in Mechanical or move to Aerospace, and that he chose to stay in Mechanical. Demuren also does not dispute that the University devoted greater resources to the Aerospace Department because of its close ties to NASA, a major source of research contracts for ODU, and its potential for national prominence. Finally, Demuren does not dispute that the Aerospace Department contains professors of foreign descent, including its Chair. In short, Demuren's allegations about the Aerospace Engineering Department, as with his comparison to Dr. K, fail to raise a genuine issue of material fact with respect to his discriminatory compensation claim.

Demuren alleges that in addition to national origin discrimination, his salary is low in retaliation for his EEOC complaints. Demuren filed a charge with the EEOC on April 15, 1995, and again on March 18, 1997. Those actions clearly constitute protected activity, but Demuren fails to demonstrate any adverse employment action, and he fails to establish a causal connection between any adverse action and his protected activity. As discussed above, Demuren's evidence does not establish that his salary or salary increases are unfairly low. In addition, Demuren offers no evidence showing that changes in his salary or in the level of his salary increases corresponded with his EEOC filings. Thus, Demuren fails to establish a prima facie case of retaliation. Moreover, to the extent that Demuren can demonstrate any low salary increases temporally related to his EEOC complaints, defendants assert that Demuren's poor publication record is the reason for his recent lower increases, and Demuren fails to offer any evidence countering that explanation. Thus, Demuren fails to

ommended against Demuren's promotion in 1994 and 1995 based upon this decline in his research productivity, as well as the small number of graduated doctoral students supervised by Demuren, and his lack of involvement in professional organizations. While Demuren asserted in his three letters that his short tenure at ODU accounted for his small number of graduated doctoral students, he fails to challenge defen-

dants' explanation with respect to his declining research productivity and lack of professional service. Thus, Demuren fails to raise a genuine question of material fact with respect to the reason for his nonpromotions in 1994 and 1995.

15. The Science Citation Index lists the number of times that a particular author's works have been cited.

raise a genuine issue of material fact with respect to his retaliation claim, as well. Accordingly, summary judgment as to Demuren's claims is appropriate.

### 2. Moustafa

■ Plaintiff Moustafa's only claim is that he received discriminatory compensation. As with Demuren, Moustafa offers no direct evidence to support his allegation, but instead relies on indirect evidence, pursuant to the *McDonnell Douglas* framework.

Moustafa is the fifth-highest paid professor in his Department out of eighteen, and all four faculty members with higher salaries have current or past administrative appointments. Nonetheless, he alleges that since 1992, he has received lower salary increases than similarly-situated Caucasian professors. Moustafa notes that his raise for the 1997–1998 academic year was 3.6%, while the Department average was 7%. However, he does not compare his performance to the performances of other professors in the Department, so there is no evidence in the record that his salary increase in 1997 was unfairly low. Moustafa also states that his salary increases have been lower than the increases of four Caucasian professors in his Department, despite the fact that he has greater seniority and more experience.[16] However, Moustafa does not dispute that seniority and years of experience are not significant factors in salary increase determinations. Moustafa fails to allege that he compares favorably with his four comparators in the areas that do have a significant impact on a professor's salary. Because Moustafa fails to allege any facts demonstrating that his salary increases were unfairly low, he fails to establish a prima facie case of discrimination.

Even if the level of Moustafa's salary increases is sufficient to establish a prima facie case of discrimination, defendants offer a nondiscriminatory explanation for Moustafa's low increases. Defendants assert that research grant and publication productivity are significant salary determinants, and that Moustafa has generated little external grant funding and published very little. In addition, defendants argue that Moustafa's comparators, who have lower overall salaries than Moustafa despite the fact that they have outperformed him, have been receiving higher raises recently to bring their salaries into line with Moustafa's salary.

Moustafa does not contest defendants' explanation, but he does allege that teaching and service are more important criteria in his Department than they are in other departments in the College of Engineering. However, Moustafa offers no evidence to support this allegation. Moreover, even assuming his allegation is true, Moustafa fails to demonstrate that he compares favorably with his comparators or other faculty in his Department with respect to teaching and service, other than to allege that his teaching evaluations have been positive. Thus, even assuming that Moustafa's evidence does establish a prima facie case against defendants, Moustafa fails to raise a genuine issue of material fact regarding defendants' nondiscriminatory explanation for the level of his salary increases. Accordingly, summary judgment as to Moustafa's claim is appropriate.

### 3. Nguyen

■ As with plaintiff Moustafa, plaintiff Nguyen's only claim is that he received discriminatory compensation. Nguyen also offers no direct evidence to support his claim, but instead relies on indirect evidence, pursuant to the *McDonnell Douglas* framework.

16. Moustafa also compares himself to Mr. Williams. In 1996, Williams was denied tenure, then re-hired by the Department and given a raise (13%) substantially higher than Moustafa's raise that same year (3.5%). However, Moustafa fails to demonstrate that he and Williams are similarly situated. Williams was denied tenure as a computer technician and rehired as a lecturer, whereas Moustafa has been continuously employed as a professor. Moreover, defendants assert that Williams's change in status accounted for his significant salary increase in 1996, and they note that for the 1998–1999 academic year, Williams received a 4.2% raise, as opposed to Moustafa's 5% raise. In addition, defendants explain that Williams's marketability as a lecturer dictated his salary when he was rehired. Even if the comparison between Moustafa and Williams establishes a prima facie case of discrimination, Moustafa fails to rebut this nondiscriminatory explanation for Williams's pay increase.

Nguyen does not dispute that his annual salary increases have been higher than the average increase for professors in his Department. Instead, he bases his discrimination claim on the fact that his salary is the lowest of all Full Professor salaries in the College of Engineering. He alleges that a study by the current Dean of the College reveals that his performance has been above average in the areas of teaching, grant production, publications, and service, and that his salary should reflect his level of performance. Plaintiff provides no foundation for this study, so it is not clear that it is admissible as evidence to support his claim. Moreover, the study fails to establish a prima facie case of discrimination because Nguyen's above average salary increases have reflected his above average performance.

Nguyen also identifies one specific comparator, Dr. Gary Schafran, in his Department, and notes that in 1992, defendant Drewry requested a $5000 raise for Schafran but not for Nguyen, and that between 1991 and 1996, Schafran received higher raises, on average, than Nguyen. However, Nguyen fails to identify any measurable criteria demonstrating that his performance between 1991 and 1996 was comparable to Schafran's performance.[17]

Even if Nguyen's low salary establishes a prima facie case of discrimination, defendants assert that Nguyen's salary is low because he was promoted to Full Professor so recently.

Nguyen attempts to counter defendants' nondiscriminatory explanation by noting that University administrators maintain that seniority does not play a major role in determining salaries. However, University officials actually have stated that seniority plays little role in determining the level of annual faculty salary *increases*. Seniority obviously has had little effect on Nguyen's salary increases because he has consistently received above average raises. Thus, Nguyen fails to counter defendants' nondiscriminatory explanation for his low salary. Since Nguyen's evidence fails to raise a genuine issue of material fact, summary judgment as to Nguyen's claim is appropriate.

*4. Prabhakaran*

 Plaintiff Prabhakaran alleges four separate acts of discrimination and retaliation: 1) unfair compensation; 2) his exclusion from the Dean Search Committee; 3) his failure to receive the 1996 University Outstanding Research Award; and 4) his failure to receive Eminent Scholar status in 1997.[18] Prabhakaran's protected activity includes: 1) testifying during the 1989 trial of Professor Samir Ibrahim's discrimination case; 2) filing a grievance against defendant Ash; and 3) "complaining about discrimination."[19]

 As a preliminary matter, it does not appear that three of the adverse employment actions that Prabhakaran alleges—ex-

17. Nguyen's only evidence is a 1992 memo from defendant Drewry to all faculty in Civil and Environmental Engineering praising both Nguyen and Schafran, in addition to Professors Akan and Cheng.

18. As discussed above, Prabhakaran's claim that he was unfairly denied Eminent Scholar status in 1990 is untimely. However, even if it were timely, it lacks merit. Prabhakaran's only evidence in support of his claim is that his professional record compares favorably to the records of Drs. Ash and Dahiya of the College of Engineering, who were designated Eminent Scholars in 1989. However, Prabhakaran compares himself to Ash and Dahiya only with respect to years of experience, number of journal papers, number of published conference papers, and number of Ph.D. and Master's students supervised. The Eminent Scholar Committee considers many other factors, as well. For example, when Prabhakaran failed to achieve Eminent Scholar status in 1997,

the Committee informed him that participation in symposia or conferences, and number of textbooks authored were two areas in which his performance was deficient. Because Prabhakaran presents no evidence that his performance with respect to all of the Committee's factors was comparable to the performances of other Eminent Scholars, he fails to raise a genuine issue of material fact with respect to his failure to achieve Eminent Scholar status in 1990.

19. The Fourth Circuit has held that protected activity under Title VII includes not only formal actions, such as filing an EEOC charge or a civil suit, but also "informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). However, Title VII does not "immunize insubordinate, disruptive, or nonproductive behavior at work." *Id.*

clusion from the Dean Search Committee, failure to receive the 1996 award, and failure to receive Eminent Scholar status—qualify as actionable events under Title VII.[20] Title VII prohibits discrimination with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). In *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981), the Fourth Circuit suggested that "there are many interlocutory or mediate [employment] decisions having no immediate effect upon employment conditions which were not intended to fall" under Title VII. Citing *Page*, the Fifth Circuit held that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995). According to the Fifth Circuit, ultimate employment decisions include acts " 'such as hiring, granting leave, discharging, promoting, and compensating.' " *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.) (quoting *Dollis*'s parenthetical explanation of *Page*), *cert. denied*, —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). Prabhakaran's exclusion from the Dean Search Committee, his failure to receive the Outstanding Research Award, and his failure to receive Eminent Scholar status are not nearly of the same magnitude as the ultimate employment decisions recognized in *Dollis* and *Mattern*. Rather, they are the type of interlocutory decision that the Fourth Circuit does not regard as falling under Title VII.

In any event, even if all of Prabhakaran's claims are actionable, he fails to present any evidence that raises a genuine issue of material fact. In support of all four of his claims, Prabhakaran relies, in part, on allegedly di-

rect evidence of defendant Ash's discriminatory and retaliatory animus. For example, Prabhakaran claims that in a 1992 conversation with another Mechanical Engineering professor, Ash referred to the "crazies" in the Department. Prabhakaran cannot show that this comment referred to him, specifically. Even assuming it did, "crazies" is not an ethnic slur, nor does it demonstrate retaliatory animus. Thus, Ash's statement supports no reasonable inference of discrimination or retaliation.

Prabhakaran also claims that in a meeting with other ODU administrators, Ash discussed eliminating him. The only evidence of this discussion is a notation that acting Provost David Hager made of the meeting. The notation states that "Ibrahim [also a professor in the Mechanical Engineering Department] & Prabhakaran need to leave/be eliminated before MEM [the Mechanical Engineering Department] settles down." Prabhakaran cannot show that Ash made or even supported this suggestion. Moreover, Prabhakaran does not dispute Hager's testimony that the purpose of the meeting was to discuss problems in the Mechanical Engineering Department. Suggesting that Prabhakaran be removed because of his negative impact on the performance of the Department does not amount to discrimination or retaliation for his protected activity. *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) ("[Title VII] was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work."); *accord Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir.1989) (holding that an employer's refusal to promote an employee who "had earned the reputation as a disruptive complainer who anta-

---

20. If these actions are not Title VII violations, they also fail to constitute either § 1981 or § 1983 violations. Other circuits have recognized that the protections afforded by Title VII and § 1981 are coextensive. *See, e.g., London v. Coopers & Lybrand*, 644 F.2d 811, 818 (9th Cir. 1981) ("The guarantees of § 1981 and Title VII against racial discrimination are coextensive, and neither is greater or lesser than the other in scope."); *Carrion v. Yeshiva Univ.*, 535 F.2d 722, 729 (2d Cir.1976) (holding that § 1981 and § 1983 provide "no greater or lesser protection against discriminatory practices" than Title VII).

Section 1983 provides no substantive remedy, but rather merely affords a cause of action for a violation of the Constitution or federal law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617–18, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). If Prabhakaran's exclusion from the Dean Search Committee, his failure to receive the 1996 University Outstanding Research Award, and his failure to receive Eminent Scholar status are not Title VII violations, there is no underlying violation of federal law to support Prabhakaran's § 1983 claim.

gonized her supervisors and colleagues and impaired the morale of her unit"· did not violate Title VII). Prabhakaran produces no evidence of a contrary motive behind Hager's notation. Therefore, the notation also fails to raise an inference of discrimination or retaliation.

Prabhakaran's other allegations regarding defendant Ash, such as his claim that Ash "prevented other faculty from associating with [him], thus isolating [him]," are completely unsupported speculation that fail to raise a genuine issue of material fact. Thus lacking direct evidence of discrimination, Prabhakaran must rely on the *McDonnell Douglas* framework to establish each of his four claims.

### a. Discriminatory Compensation

 Prabhakaran's first specific claim is that his salary is unfairly low because of defendants' discrimination and retaliation for his protected activity. Prabhakaran does not dispute the fact that most of his annual salary increases have been above the average increase for professors in his Department. Instead, in support of his claim, Prabhakaran compares his salary and professional accomplishments with the salary and accomplishments of three Caucasian professors in the College of Engineering.[21] However, at least two of his three comparators have served as Chairs of their departments, so they are not similarly situated to Prabhakaran. Furthermore, Prabhakaran's criteria—years since receiving a Ph.D., years as a Full Professor, number of journal papers, number of published conference papers, number of Ph.D. and Master's students supervised, and nature of work—are not equivalent to the criteria that the College uses to determine salary increases.[22] Prabhakaran provides no evidence that he is similarly situated to his comparators in terms of the College's salary criteria. Thus, Prabhakaran fails to establish a prima facie case of discriminatory compensation.

Prabhakaran likewise fails to establish a prima facie case of retaliatory compensation. He alleges, in very general terms, that his salary is retaliatory. However, Prabhakaran does not demonstrate that he suffered from any adverse employment action because, as discussed above, he cannot show that his salary is unfairly low. Moreover, he fails to establish any connection between a change in his salary or his annual pay raises, and his participation in protected activity. The only fact that he offers to support his retaliation claim is. that during the late 1980's and early 1990's, around the time that he testified at Professor Ibrahim's trial and filed his grievance against defendant. Ash, the rate of his annual salary increases declined. However, the information that Prabhakaran provides shows that the rates of his comparators' salary increases similarly declined over the same period of time, demonstrating that faculty salary increases, in general, were low during the late 1980's and early 1990's.

In short, Prabhakaran fails to establish a genuine issue of material .fact through the *McDonnell Douglas* framework with respect to his discriminatory and retaliatory compensation claim. Thus summary judgment as to Prabhakaran's first specific claim is appropriate.

### b. Exclusion from the Dean Search Committee

Prabhakaran's second specific claim is that defendant Gora excluded him from the Dean Search Committee because of his nationality and in retaliation for his protected activity. On August 9, 1996, defendant Gora asked each department in the College of Engineering and Technology to nominate two faculty members for service on a Search Committee for a new Dean of the College. From the list of twelve names, Gora stated that she would select six for service on the Committee. Prabhakaran was one of the two nominees from the Department of Mechanical Engineering. However, when Gora announced the members of the Committee on August 30, 1996,

---

**21.** Prabhakaran also compares himself to Professors Kandil and Mei, but both Kandil and Mei are of foreign descent.

**22.** Prabhakaran objects to the importance that the College places on purchase release time in determining salary. This argument obviously does not form the basis for a discrimination claim.

neither Prabhakaran nor Professor Ibrahim, the other nominee from the Department, were selected. Instead, Gora placed a Caucasian female faculty member from the Department on the Committee.

While Prabhakaran claims that Gora's actions were both discriminatory and retaliatory, he fails to establish any connection between his exclusion from the Committee and any protected activity. Prabhakaran presents no evidence that Gora was even aware of his protected activity, much less that his exclusion from the Committee was in retaliation for such activity. Furthermore, both his testimony at Professor Ibrahim's trial and his grievance against defendant Ash appear to have taken place in the late 1980's, nearly a decade before Gora's action.[23] The Fourth Circuit recently held that a three-year lapse between a plaintiff's protected activity and an adverse employment action "negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998).

Even if Prabhakaran's exclusion from the Search Committee establishes a prima facie case of discrimination and retaliation, defendants offer a nondiscriminatory explanation for Gora's decision. At the time of Prabhakaran's exclusion from the Committee, Gora explained to Chairman Selby that she selected a female assistant professor from the Department because of the underrepresentation of women and junior faculty on the Committee.

Prabhakaran attempts to raise a genuine issue of fact with regard to Gora's explanation. First, he argues that since the Committee already had one female faculty member, adding a second female professor resulted in an overrepresentation of women on the Committee. Regardless of the merit of this rebuttal, Prabhakaran fails to counter Gora's assertion of the need for junior faculty representation on the Committee. Prabhakaran also notes that in a meeting with Mechanical Engineering faculty following the selection of the Committee,

Gora expressed concern that, knowing of their concerns about the University administration, Prabhakaran and Ibrahim would project a negative image if they served on the Committee. Prabhakaran argues that this statement shows that Gora's real motivation in excluding him from the Committee was retaliation for his past protected activity. However, under the Fourth Circuit's "pretext-plus" standard, Gora's statement fails to raise a genuine question of fact about her actual motivation for excluding Prabhakaran from the Search Committee. The statement provides no indication that Gora excluded Prabhakaran in retaliation for his protected activity. Excluding Prabhakaran from the Committee out of concern that his negativity could impede the Committee's ability to recruit a new Dean for the College of Engineering is not retaliation actionable under Title VII. *Cf. Armstrong*, 647 F.2d at 448 ("[Title VII] was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work."); *Rollins*, 868 F.2d at 401 (holding that an employer's refusal to promote an employee who "had earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit" did not violate Title VII).

Prabhakaran's evidence, pursuant to the *McDonnell Douglas* framework, fails to raise a genuine issue of material fact with respect to his exclusion from the Dean Search Committee. Thus, summary judgment as to the second of Prabhakaran's claims is appropriate.

### c. Failure to Receive the 1996 University Outstanding Research Award

Prabhakaran's third specific claim is that his failure to receive the 1996 University Outstanding Research Award for which he was nominated was due to discrimination and retaliation. Prabhakaran's only allegation in support of this claim is that defendant Ash prevented him from receiving the award. This allegation is entirely without merit.

---

**23.** Prabhakaran fails to say when he engaged in his third possibly protected activity, "complain-

ing about discrimination."

Defendants explain that Ash's office merely collected nominations for the award and forwarded them to the Faculty Senate Committee responsible for choosing the recipient. Ash had nothing to do with the selection process. In response, Prabhakaran does not dispute the accuracy of defendants' description of the process. Instead, he charges that Ash has "unlimited access to the topmost administrators," that faculty are "aware of his power and influence," and that his negative opinions about Prabhakaran affected the selection Committee's decision. He offers absolutely no evidence to support this theory. Because his allegations with respect to the Outstanding Research Award are entirely without merit, and fail to raise a genuine issue of material fact, summary judgment as to Prabhakaran's third specific claim is appropriate.

### d. Failure to Receive Eminent Scholar Designation

Prabhakaran's final specific claim is that the University's failure to grant him Eminent Scholar status in 1997 was discriminatory and retaliatory. The University Eminent Scholar Committee decides whether to grant a professor Eminent Scholar status. Defendant Gora reviews the Committee's decisions, but the undisputed evidence is that she never overrules the Committee. Prabhakaran contends that his professional accomplishments qualify him for Eminent Scholar status. Specifically, he notes that he has served as an editor of an international journal, and is a Fellow in the Society for Experimental Mechanics.

Prabhakaran does not compare his credentials to any of the College of Engineering's current Eminent Scholars, nor does he establish any connection between his failure to receive Eminent Scholar status in 1997 and his protected activity nearly a decade earlier. Prabhakaran also does not dispute that all five of the College's current Eminent Scholars are foreign born, and four of the five are non-Caucasians—two are Asian–American, one is Turkish, and one is Egyptian. In addition, at the time of his denial, the Eminent Scholar Committee explained that Prabhakaran's credentials did not satisfy the Committee's selection criteria. Specifically,

the Committee noted deficiencies in the level of Prabhakaran's participation in symposia or national conferences, and in the number of invited chapters, monographs, or textbooks that he has authored. Prabhakaran argues that these and other criteria upon which the Committee based its decision do not match the criteria for evaluating professorial performance listed in the Faculty Handbook. However, Prabhakaran fails to counter defendants' explanation that the Committee uses criteria that differ from those upon which the University evaluates faculty performance, in general, and that those criteria do not appear in the Handbook.

Prabhakaran fails to establish a prima facie case of discrimination or retaliation with respect to his failure to receive Eminent Scholar status. Moreover, he fails to raise a genuine issue of material fact with respect to defendants' nondiscriminatory explanation. Thus, summary judgment as to Prabhakaran's final claim is appropriate.

### IV. Conclusion

Defendant ODU is immune from suit under 42 U.S.C. § 1981 and § 1983, so plaintiffs may bring only their Title VII claims against ODU. They may bring their § 1981 and § 1983 claims against the individual defendants. All four plaintiffs' discriminatory and retaliatory compensation claims are timely because discriminatory and retaliatory compensation is a continuing violation. Thus, only plaintiff Demuren's claim that he was unfairly denied promotion in 1994 and 1995, and plaintiff Prabhakaran's claim that he was unfairly denied Eminent Scholar status in 1990 are time-barred. However, plaintiffs fail to establish a genuine issue of material fact with respect to any of their claims, either through direct evidence of discrimination and retaliation, or through indirect evidence pursuant to the *McDonnell Douglas* framework. Therefore, defendants' motion for summary judgment is **GRANTED**.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Final Order to counsel for the parties.

**IT IS SO ORDERED.**