**J. Bruce BARNETT, Plaintiff,**

**v.**

**TECHNOLOGY INTERNATIONAL, INC., Defendant.**

**No. Civ.A. 3:97CV771.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 8, 1998.

573

David R. Simonsen, Jr., Richmond, VA, for Plaintiff.

David E. Constine, Kimberly W. Daniel, D. Eugene Webb, Mays & Valentine, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

J. Bruce Barnett initiated this action against Technology International, Inc. ("TII"), alleging that TII discriminated against him because of his national origin, which is American, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* TII has moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons which follow, the motion for summary judgment is granted.

## STATEMENT OF FACTS

Barnett is a citizen of Virginia. (Mot. Judgment ¶ 2.) His nation of origin is the United States. *(Id.)* Beginning his employment on May 31, 1994, with TII, a subsidiary of Technology International Europe LTD, a company located in the United Kingdom, Barnett served as TII's chief financial officer from July 1996 until April 4, 1997. *(Id.* ¶¶ 10–11; *see* Caran Aff. ¶ 4.)

Because of the nature of its business, TII, on occasion, requires employees whose primary residence, or domicile, is a country other than the United States to work in the United States. (Caran Aff. ¶ 6.) TII, to date, has employed only five individuals who were not residents of the United States at the time they were hired by TII. (Caran Decl. ¶ 2.) Because Technology International Europe LTD is headquartered in the United Kingdom, the policy is focused on employees who are residents of the United Kingdom. Indeed, the policy itself sometimes uses the term "UK" in describing the benefits available to "non-US employees." However, the record is that the benefits are considered to be available to all employees who are not residents of the United States who are hired to work for TII in the United States, whether they reside in the United Kingdom or elsewhere outside the United States before

coming here to work for TII. (Caran Aff. ¶ 7).

These "non-US employees," [1] as they are identified in TII's benefits package, are provided certain fringe benefits that are not offered to TII employees who are residents of the United States. *(See* Mot. Judgment Ex. 1; Caran Aff. ¶ 6.) The benefits offered to the "non-US employees" are: (1) initial airfare to the United States for the employee, and his family in addition to one pre-move house-hunting trip; (2) paid round-trip airfare for the employee and family to the United Kingdom once every eighteen months; (3) an H1B Visa for non-U.S. resident employees and members of their families; (4) a three-year term of employment with a renewal option; (5) ninety days notice of termination of employment or ninety days pay in lieu of such notice; and (6) return travel expenses to the country of which the employee was a resident before moving to the United States upon termination of employment. (Mot. Judgment at Ex. 1.)

On April 4, 1997, Barnett was discharged by TII, allegedly because of inadequate performance. (Caran Aff. ¶ 4.) Barnett was provided neither ninety days notice of his termination nor ninety days pay in lieu thereof. (Mot. Judgment ¶ 12.) [2] By affidavit, Althea A. Caran, chief executive officer of TII, avers that Barnett would have received those benefits "if his primary residence was any country other than the United States." (Caran Aff. ¶ 8.) Caran also explains that "[t]he policies of TI[I] ... do not depend in any way upon the national origin of an employee ... but, rather, depend entirely upon the primary residence or domicile of the individual employee." *(Id.* ¶ 9.)

Barnett filed a timely charge of discrimination with the Equal Employment Opportunity Commission and received notice of his right to sue. Thereafter, Barnett filed this action in the Circuit Court for the County of Henrico, seeking back pay and compensatory

---

1. The term "non-US employee," as used by TII in its benefits package, refers to employees whose primary residence or domicile is a country other than the United States at the time of hire. *(See* Carran Aff. ¶ 6; Caran Decl. ¶ 5.)

2. Barnett does not challenge as discriminatory any of the benefits provided to "non-US employees" by TII other than the 90–day notice provision. Instead, the exclusive basis for Barnett's national-origin discrimination claim is the 90–day notice-of-termination policy. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 3.).

and punitive damages. TII subsequently removed the action to this Court. Barnett alleges that TII has engaged in unlawful national-origin discrimination by providing ninety days notice of termination solely to employees whose primary residence or domicile is outside of the United States at the time of hire.

Barnett's original pleading asserted a discrimination claim based only upon disparate treatment. In response to TII's motion for summary judgment, however, Barnett asserted the original pleading also intended to advance a claim under a disparate-impact theory of employment discrimination. TII's reply brief and supporting papers demonstrated that the disparate-impact claim had no merit. After oral argument, the Court ruled from the bench that TII was entitled to summary judgment on the disparate-treatment claim, the only claim manifest on the face of Barnett's original pleading, as well as the belatedly advanced disparate-impact claim.

At that point, Barnett asked for leave to file a supplemental brief and that request was granted.[3] Having reviewed the supplemental briefs filed by both parties and the additional supporting materials filed by Barnett, the Court remains of the view that TII is entitled to summary judgment on both claims.

## DISCUSSION

### A. STANDARD GOVERNING SUMMARY JUDGMENT

Summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and of establishing, based on relevant portions of the record, that there is no genuine issue of material fact and that it is entitled to judg-

ment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 216 (4th Cir.1987); *Catawba Indian Tribe of South Carolina v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992); Fed.R.Civ.P. 56(c). "[W]here the non-moving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories and admissions on file.'" *Celotex,* 477 U.S. at 324. The moving party may also use affidavits in support of its motion.

Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the non-moving party. In this regard, the non-moving party "may not rest upon the mere allegations or denials of" its pleading; rather, the non-moving party must, by citing its own affidavits or referring to "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* When "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id.* at 257.

It is the function of the district court not to weigh the evidence but to determine whether there is a genuine issue for trial, and "there

---

**3.** Barnett also requested to reopen discovery to depose Caran and other TII witnesses. For the reasons set forth on the record of that hearing, that request was denied.

is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In passing on a motion for summary judgment, the district court must "view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. "The evidence of the non-movant is to be believed" and "all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55, 58 (4th Cir.1991). But, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see Guinness PLC v. Ward*, 955 F.2d 875, 883 (4th Cir.1992).

A court must, however, exercise due care in deciding whether the evidence presents a genuine issue of motive or intent because "summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense," such as national origin discrimination cases, as is the case here. *Cf. Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) (citation and internal quotation marks omitted), *overruled on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). "The fact that motive is often the critical issue in employment discrimination cases," however, does not mean that Rule 56 has no function in Title VII litigation. *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1004 (4th Cir.) (citations omitted), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *see Ross*, 759 F.2d at 365. If the dispute between the parties is not material or not genuine, summary judgment is appropriate.

With these principles in mind, the Court will consider TII's motion for summary judgment.

## B. ANALYTICAL FRAMEWORK Oₓ TITLE VII

■ Fashioned " 'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identified group of white employees over other employees,' "[4] Title VII now makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Title VII's prohibition includes "not only overt discrimination [commonly referred to as disparate-treatment discrimination] but also practices that are fair in form, but discriminatory in operation [commonly referred to as disparate-impact discrimination]." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ Under the "disparate-treatment" scenario of employment discrimination, which, of course, is "the most easily understood [form] of discrimination," a plaintiff must demonstrate that the "employer ... treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Proof of discriminatory intent, in disparate treatment cases, "is critical, although it can in some situations be inferred from the fact of differences in treatment." *Id.*

■ Claims predicated on the "disparate impact" theory, by contrast, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* A plaintiff advancing a claim of discrimination under the disparate-impact theory of liability need not prove discriminatory intent. *See id.*

Barnett has presented claims against TII for national-origin discrimination under the

---

4. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

disparate-treatment and disparate-impact theories of liability under Title VII. They are considered *seriatim*.

### 1. Disparate Treatment: Discrimination on the Basis of Citizenship or National Origin

The Supreme Court has long recognized the distinctions between "disparate-treatment" and "disparate-impact" theories of employment discrimination.

▇▇▇ The central focus of a disparate-treatment claim is whether a protected characteristic of the employee motivated the employment action taken by the employer. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Barnett alleges that TII's policy of providing "non-US employees" ninety days notice of termination, or ninety days pay in lieu of such notice, is intentional discrimination on the basis of national origin, and thus violative of Title VII, because only those individuals who are not of American ancestry receive such a benefit. (Mot. Judgment ¶ 8.) The issue, then, is whether TII's notice-of-termination policy constitutes disparate treatment on the basis of national origin, which is a protected class under Title VII, or is based on some other trait that is afforded no such protection.

Confronted with an employer's long-standing practice of refusing to employ aliens, the Supreme Court of the United States, in *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), delineated the breadth of the statutory term "national origin" in Title VII. There, the Supreme Court held that Title VII's prohibition against "national-origin" discrimination protects against discrimination in the workplace on the basis of "where a person was born, or, more broadly, the country from which his or her ancestors came."[5] *Id.* at 88 (footnote omitted). Having accorded that interpretation to "national origin," the Supreme Court added that the reach of Title VII's ban against national-origin discrimination did not go so far as to prevent discrimination in employment solely on the basis of an employee's citizenship. *Id.* at 95. ("Aliens are protected from illegal discrimination under [Title VII], but nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage.") Examining the legislative history of section 701(b) of Title VII, the Supreme Court found "no mention of any intent on Congress' part to reverse the long-standing practice of requiring federal employees to be United States Citizens." *Id.* at 90. "To interpret the term 'national origin' to embrace citizenship requirements," stated the *Espinoza* Court, "would achieve the rather bizarre result of preventing [private employers] from insisting on United States citizenship as a condition of employment while the very agency charged with enforcement of Title VII would itself be required by Congress to place such a condition on its own personnel." *Id.* at 91.[6]

Barnett concludes that TII's policy of providing ninety days notice of termination, or ninety days pay in lieu of such notice, to "non-US employees" reflects disparate treatment of employees of American ancestry because every employee of TII who has not received such notice was of American national origin. In essence, the crux of Barnett's claim is that the provision of benefits on the basis of one's "primary residence" or "domicile" reflect an intent to provide those benefits on the basis of one's "national origin." In actuality, however, Barnett's claim of intentional discrimination is based on a citizenship prerequisite in TII's benefit package, of which the ninety-day termination (or pay) provision is but one component. For that

5. "[T]he terms 'national origin' and 'ancestry' [are] considered synonymous." *Espinoza,* 414 U.S. at 89.

6. Decisions since *Espinoza* confirm that discrimination on the basis of citizenship does not constitute national-origin discrimination within the meaning contemplated by Title VII, and at least one court has advanced a rationale somewhat different than that put forth by the Supreme Court in *Espinoza. See, e.g., Fernandes–Middleton v. Air India,* No. 89–0543, 1989 WL 222970, at *1 (D.D.C. Dec. 28, 1989) ("Unlike an individual's birthplace, *the status of citizen is not permanent....* ") (emphasis added).

reason, the claim is not cognizable under Title VII.

The affidavit of Althea Caran, chief executive officer of TII, and an examination of the benefits package in its entirety, explains that TII offers certain benefits to individuals who reside or are domiciled in a country other than the United States as an incentive to relocate to, and work in, the United States. (Caran Decl. ¶ 5.) That assertion is borne out by the nature of the benefits package because all of those benefits, in one way or another, ameliorate the hardship of relocating to the United States from the place where the employee resides. On the other hand, not one of the benefits is remotely related to where the relocating employee was born.[7]

Barnett does not challenge any component of the benefit package available to TII's non-US citizen employees other than the ninety-day termination benefit. The challenge to this single component of an admittedly otherwise valid benefit package is that it alone is a pretext for favoring those who are born outside the United States. It is hard to fathom why this component alone is singled out for attack, but it appears that the real basis for this notion is Barnett's perception that, unlike the rest of the package, this component is not ameliorating in the same sense as the other features of the package that are not challenged.

According to TII, the purpose of providing ninety days notice of termination to non-U.S. employees is to assure them that "they will have sufficient time, with compensation, to get their affairs in order" before returning "to their primary residence if their employment with [TII] should be terminated." (Caran Decl. ¶ 5). That is logical and it is supported by the ameliorating nature of the benefit package of which the ninety-day provision is but one part.

Although, in some situations, discrimination on the basis of citizenship may have "the purpose or effect of discriminating on the basis of national origin," *see Espinoza*, 414 U.S. at 92,[8] there is not scintilla of evidence in this record that this particular benefit was a subterfuge for intentional discrimination on the basis of national origin. Rather, the undisputed evidence reveals that any differentiation that occurred in this case was because of residence or domicile, not because of membership in a class protected by the provisions of Title VII. *See Anderson v. Zubieta*, 977 F.Supp. 439, 442 (D.D.C.1997). Indeed, Barnett admits that "[e]very employee of TII who has received the benefit of 90 days notice of termination or 90 days pay in lieu of such notice" was a "resident[ ] of a nation other than the United States when hired to work for TII in the United States." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 3 (emphasis added).) Barnett also acknowledges that "[e]very employee of TII who has NOT received the [notice of termination] benefit" was a "resident[ ] of the United States when hired to work for TII in the United States." (*Id.* (first emphasis in original).) TII does not have a different policy for the foreign born and for those born in the United States; rather, TII provides ninety days notice for those employees who are citizens or domiciliaries of a country other than the United States at the time they are required to relocate to the United States to work for TII. Importantly, Barnett has offered no evidence suggesting that TII furnished ninety days notice to an employee residing in the United States at the time the employee was hired, yet was born in a country other than that of the United States. *See Fernandes–Middleton v. Air India*, No. 89–0543, 1989 WL 222970, at *2 (D.D.C. Dec. 28, 1989).

Barnett's disparate-treatment claim, in essence, rests upon the allegation that he was

---

7. *See, e.g., Espinoza*, 414 U.S. at 95 n. 6, ("[The defendant], however, does not have a different policy for the foreign born than for those born in the United States. It requires of all that they be citizens of the United States.").

8. The Supreme Court, in *Espinoza*, observed:
 In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship [requirement] as a pretext to disguise what is in fact national-origin discrimination. Certainly Title VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin.
 *Espinoza*, 414 U.S. at 92.

treated differently because of his residence or domicile. Accordingly, Barnett's allegation of disparate treatment under Title VII cannot survive summary judgment.

### 2. Disparate Impact

Barnett also argues that TII's notice-of-termination policy has a disparate impact on employees of American ancestry and, for that reason, violates the proscriptions of Title VII. According to Barnett, "[e]very employee of TII who has received the benefit of 90 days notice of termination or 90 days pay in lieu of such notice, was of a national origin . . . and citizenship other than that of the United States; any such employee's national origin was that of the United Kingdom." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 3.)

 To succeed on a claim of disparate-impact discrimination, a plaintiff need not provide evidence of the employer's subjective intention to discriminate. Instead, a plaintiff must demonstrate that a policy applied by his employer, although neutral on its face, is discriminatory in its application. *Griggs*, 401 U.S. at 431. To prove a prima-facie case of disparate-impact discrimination, a plaintiff must identify the specific employment practice being challenged, and then demonstrate that the policy excluded the plaintiff, as a member of a protected group, from certain benefits of employment. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). If the plaintiff establishes a prima facie case, the burden then shifts to the employer to produce evidence that its policy is job-related, that is, the "challenged practice serves, in a significant way, the legitimate business goals of the employer." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *see Watson*, 487 U.S. at 997–99; *Griggs*, 401 U.S. at 432. Even if the challenged policy significantly serves the employer's legitimate business goals, the plaintiff, who of course has the ultimate burden of persuasion, *see Watson*, 487 U.S. at 997, may still succeed under a disparate-impact case by demonstrating the availability of an alternative practice that would serve the asserted legitimate business needs of the employer

without a corresponding prohibited discriminatory effect. *See Wards Cove*, 490 U.S. at 659–61.

 Statistics oftentimes play a critical rule in establishing the existence of illegal discrimination in the workplace. *Carter v. Ball*, 33 F.3d 450, 456 (4th Cir.1994). Statistical evidence, for example, may permit an inference of discrimination or reveal as pretextual the employer's claim of a legitimate, nondiscriminatory reason for the challenged action. *See id.* at 456. Statistics, however, are probative only to the extent that they reveal a disparity of such a degree as to rule out chance; in other words, "statistical disparities must be sufficiently substantial that they raise . . . an inference of causation." *Watson*, 487 U.S. at 995.

 Barnett contends that statistical evidence illustrates that application of TII's notice-of-termination policy results in a disparate impact on those TII employees of American ancestry. In particular, Barnett asserts that an inference of national-origin discrimination is permissible given the fact, upon dismissal by TII, that not one person of American ancestry employed by TII received ninety days notice of termination or ninety days pay in the absence of such notice. According to Barnett, "the chances of this 100% correlation occurring by chance is virtually zero." (Supplemental Mem. Opp'n Def.'s Mot. Summ. J. at 9.) The numerical evidence offered by Barnett, however, is not sufficient to prove the premise that he must establish to prevail under a disparate-impact theory of employment discrimination.

Indeed, because of the small sample size involved, the statistics offered by Barnett are of little utility in determining whether TII's notice-of-termination policy adversely impacts a protected group. As the Fourth Circuit has observed, it is improper to place reliance on statistical analyses based on a small statistical sample. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994) *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 (7th Cir.1983) "[G]iven that small changes in the numbers will have a potentially huge effect on the statistical showing[,] . . . it [is] improper to rely on the

results of statistical analyses" which involve too small a sample size. *Birkbeck,* 30 F.3d at 511. Here, the small sample size on which Barnett rests his disparate-impact claims prevents a reasonable inference of discrimination from what Barnett asserts to be a statistical disparity.

Although, as Barnett alleges, TII may have employed twenty-two employees in July 1996, the relevant statistical pool is the number of individuals terminated by TII because, by its terms, a notice-of-termination policy cannot have a disparate impact on a protected group unless and until an employee is terminated. *See id.* Barnett is thus left to draw statistical significance from the fact that he was one of seven individuals discharged by TII.[9] Thus, what purports to be statistical evidence fails to raise the inference, as a matter of law, that TII's application of its notice-of-termination policy results in a disparate impact on a protected group. *See id.; EEOC v. Western Elec. Co.,* 713 F.2d 1011, 1018 (4th Cir.1983) ("Like any other type of circumstantial evidence, statistical evidence 'must not be accepted uncritically,' and because many statistical models ... are sophisticated and complex, courts must give

'close scrutiny [to the] empirical proof" on which the models are erected.") (footnotes and citations omitted) (alteration in original); *see, e.g., Palmer v. United States,* 794 F.2d 534, 539 (9th Cir.1986) (holding that a sample size consisting of between five to thirteen is too small to have any probative force and thus must be disregarded); *Zick v. Verson Allsteel Press Co.,* 644 F.Supp. 906, 912–13 (N.D.Ill.1986) ("Merely saying six of eight employees terminated were over 40 makes too much of a very small statistical sample....") (footnote omitted), *aff'd,* 819 F.2d 1143 (7th Cir.1987).[10]

■■■ Because the evidence offered by the plaintiff in support of his claim of disparate impact is statistically insignificant and must therefore be disregarded,[11] TII's motion for summary judgment as to Barnett's claim of disparate impact is granted.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted with respect to Barnett's claims of disparate-treatment and disparate-impact employment

9. Barnett states that of the seven individuals discharged, only one such employee—a "non-U.S. employee"—was provided with ninety days notice; the other six "US employees," including Barnett, were not. Barnett fails to present any evidence as to the national origin of these individuals, although he assumes they are of American ancestry. Oftentimes an individual's citizenship and national origin coincide. Yet, in a country, such as the United States, that prides itself on the diversity of its citizens, one's citizenship and national origin are frequently different. The Court, however, will accept the plaintiff's assumption as true, according all reasonable inferences in his favor.

10. Additionally, the Fourth Circuit has instructed that district courts should "be extremely cautious in drawing any conclusions from standard deviations in the range of one to three." *EEOC v. American Nat'l Bank,* 652 F.2d 1176, 1192 (4th Cir.1981), *cert. denied.,* 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). And, "if a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence." *Carter,* 33 F.3d at 456. Although Barnett assures the Court that the chances of the statistical disparity in this case occurring by chance is virtually zero, as the Fourth Circuit has held, layman assurances are not enough.

11. Because Barnett has failed to offer sufficient evidence to establish a prima-facie case under the disparate-impact theory of liability, the Court need not address TII's burden of producing evidence that its notice-of-termination policy is job related.

Assuming, *arguendo,* that the plaintiff can demonstrate a prima-facie case, the evidence here clearly demonstrates *that TII's policy is used to* serve the legitimate and important business aim of enticing qualified employees to leave their country and work in the United States. The notice-of-termination policy assures these "non-US employees" that if they leave their primary residence and are later terminated by TII, they will have a 90–day period, with compensation, within which to get their affairs in order before returning to their home country.

That said, the plaintiff carries the ultimate burden, under a disparate-impact theory of employment discrimination, and may still prevail by proffering alternative practices that would advance *the legitimate business needs of the em-*ployer without a prohibited discriminatory effect. The plaintiff, however, has not addressed his ultimate burden of persuasion in any of his briefs.

discrimination. Accordingly, the action is dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record and shall thereafter close the file in this action.

It is so ORDERED.