**Linval A. BLAIR, Plaintiff,**

v.

**COLONNAS SHIPYARD INC., Defendant.**

**No. CIV.A. 2:98cv1360.**

United States District Court,
E.D. Virginia,
Norfolk Division.

July 7, 1999.

---

Linval A. Blair, Norfolk, VA, pro se.

Thomas M. Lucas, Ruth Litvin, McGuire, Woods, Battle & Boothe, L.L.P., Norfolk, VA, for Defendant.

### OPINION & ORDER

PRINCE, United States Magistrate Judge.

In this discrimination case, *pro se* plaintiff Linval A. Blair ("Blair") claims his former employer, Colonnas Shipyard Inc. ("Shipyard"), denied him light-duty assignments and ultimately discharged him because of his race and national origin, in violation of 42 U.S.C. § 2000e–2(a) (1999). The parties have completed discovery and have consented to have a magistrate judge dispose of this litigation pursuant to 28 U.S.C. § 636(c). The Shipyard now moves for summary judgment. Because Blair cannot establish a prima facie case of discrimination, cannot rebut the evidence showing that his discharge resulted from his violations of the Shipyard's disciplinary policy, and cannot evade the applicable Title VII time bar, the Court will GRANT summary judgment.

### I. Statement of Material Facts

Blair, a black male from Jamaica, began working for the Colonnas Shipyard on May 16, 1996, as a Second Class Outside Machinist. (Def.'s Answer at ¶ 2.) At the time of his hiring, he reviewed and signed several forms related to the Shipyard's various employment policies. (*See* Pl.'s Dep. Tr. at 118.) Among these were the Shipyard's pre-employment agreement and its employee disciplinary policy. (*See* Def.'s Ex. 2A and Ex. 3.)

The pre-employment agreement specified that the Shipyard "cannot and will not" tolerate poor attendance and late arrivals for scheduled work shifts. (Def.'s Ex. 3.) It also cautioned that "repeated incidents in these two areas will result in disciplinary action up to and including termination of employment." (*Id.*) Blair, who read and signed the agreement, understood that these areas were "very important" to the Shipyard. (Pl.'s Dep. Tr. at 118–20.)

The Shipyard's written disciplinary policy, meanwhile, set forth different forms of punishment according to the level of offense involved. (*See* Def.'s Ex. 2A and Ex. 10.) For example, employees who committed a level-one offense received a "verbal warning notice" the first time they violated that workplace rule. (*Id.*) Level-one offenses included absenteeism, which the Shipyard's policy defined as an absence of three (3) or more days in a four-week period or as sick leave not verified by a doctor's certificate. (*Id.*) A level-one offense would result in a written warning notice for the second violation, and in a "suspension pending investigation which may result in discharge" for the third violation. (*Id.*)

Similarly, employees who committed a level-two offense received a written warning notice, while those who committed a level-three offense immediately faced sus-

pension pending investigation and possible discharge. (*Id.*) Level-three offenses included situations where an employee had falsified company records. (*Id.*) And falsifying company records, according to the policy, included situations where an employee intentionally provided false information to anyone involved in making company records. (*Id.*)

After beginning his job at the Shipyard, Blair endured various injuries. In June of 1996, he suffered second-degree burns on his left leg. (Pl.'s Compl. at 2; Def.'s Answer at ¶ 3.) In August of 1996, he had several teeth knocked out. (*Id.*) In July of 1997, he sustained a finger injury and missed six weeks of work and, in September of 1997, he suffered a knee injury. (*Id.*) Blair claims he requested a light-duty assignment after each of these injuries, but the Shipyard denied each request.[1] (*See* Pl.'s Compl. at 2.)

On December 5, 1997, Blair took approximately two weeks off to have surgery performed on his stomach and finger. (Pl.'s Dep. Tr. at 130–31.) When he returned to work, he made a fifth request for a light-duty assignment and presented two medical certificates from the same physician. (*See id.* at 137–39.) The first medical certificate, dated December 10, 1997, indicated that Blair had "recovered sufficiently [from surgery] . . . to return to light work duties." (*Id.* at 137–38; Def.'s Ex. 5.) In contrast, the second medical certificate, dated December 14, 1997, stated that Blair had "recovered sufficiently . . . to return to regular work duties." (*Id.*)

The Shipyard denied Blair's request. As one Shipyard manager explained, the Colonnas Shipyard did not "have a Light Duty Shop dedicated to the employment of employees who [cannot] function in their current job classifications." (Def.'s Ex. 10.) Instead, the Shipyard assigned light-duty work to employees on a "case-by-case basis," depending on "the facts of the situation involved with that employee." (*Id.*)

The Shipyard currently has one minority employee on light-duty assignment, and it assigned another to light-duty work in 1997. (*Id.*)

The next six months appeared uneventful for Blair until June of 1998. At that time, Blair asked his supervisor, Gregory Lee Eddins, for two weeks' leave for a medical condition. (Def.'s Ex. 8.) Eddins instructed Blair that in order to have his request approved, he would need to produce "some documentation which would show that his leave would be for medical reasons." (Def.'s Ex. 8.) Blair also approached the Shipyard's human resources manager, Lucy Metcalf, "[s]ometime in July 1998" and requested leave for medical reasons. (Def.'s Ex. 2 and Ex. 9.) According to Metcalf, Blair said "his doctor wanted to run tests." (Def.'s Ex. 2.) Metcalf also told Blair that he needed a medical certificate to have his request approved. (*Id.*)

The Shipyard eventually approved Blair's request, but Blair did not see a doctor or have any other medical treatment done during his two weeks of medical leave. (*See* Def.'s Ex. 9; Pl.'s Dep. Tr. at 67–68, 141–42, 150.) Instead, he went to New York with his girlfriend to see his son. (Pl.'s Dep. Tr. at 67–68, 141–42.) There, Blair swam "in the pool sometimes" and "stay[ed] in bed." (*Id.*) He returned to work on July 27, 1998. (*See* Def.'s Ex. 10.)

On that day, Eddins and Shipyard Operations Manager Kenneth Imondi spoke to Blair and requested the medical note he needed to justify his two-week absence. (*See* Def.'s Ex. 8 and Ex. 10.) When Blair indicated that he did not have one, Imondi said he had until July 30, 1998, to return to the Shipyard with a medical note. (*Id.*) Blair returned on July 30, 1998, but instead of presenting the requested medical note, he "presented himself as if to go to work." (Def.'s Ex. 8; Pl.'s Dep. Tr. at 175.) When Eddins confronted him about

---

1. Despite these injuries, or perhaps because of them, the Shipyard promoted Blair to a First Class Outside Machinist on October 4, 1997. (Def.'s Ex. 2.)

this, Blair said that he did not have a note and that Eddins "should do whatever [he had] to do." (*Id.*) The Shipyard then suspended Blair pending an investigation. (Pl.'s Dep. Tr. at 151–52.)

Shortly thereafter, the Shipyard notified Blair that it was discharging him for "willfully giving misleading or false information on personnel records" and for failing "to substantiate his request for medical leave." (Pl.'s Dep. Tr. at 169–70; Def.'s Ex. 10B.) Shipyard business records reveal that in 1996, it terminated a white American employee for absenteeism and for falsifying papers, without affording him progressive levels of discipline. (Def.'s Ex. 1A, attached to Def.'s Reply Mem.)

According to the Shipyard, Blair filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC") on October 9, 1998, although the document filed with the Shipyard's summary judgment motion reflects neither the date nor the specific agency that actually received these charges. (*See* Def.'s Ex. 11.) Instead, the top of the document lists both the "Virginia Council on Human Rights," a state analogue to the EEOC, and the EEOC itself as the recipients of the charge. (*See id.*) Blair later addressed a letter to the Virginia Employment Commission to "appeal . . . the decision made on October 9, 1998." (Def.'s Ex. 7.)

On November 20, 1998, Blair filed this *pro se* complaint, claiming that the Colonnas Shipyard discharged him and previously failed to assign him light-duty work on account of his race and national origin. His complaint indicates that he "tried to resolve these problems [with the Shipyard] but my efforts were proven futile." (*See* Compl. at 1.) Subsequent filings allege the same, noting, for example, that Shipyard employees "staarted [sic] to complain" when they thought white employees were receiving favorable treatment.[2] (*See* Pl.'s Rebuttal at 3.)

In addition to the evidence described above, the Shipyard's summary judgment motion argues that Blair cannot establish a prima facie case of discrimination because his violations of Shipyard disciplinary policy rendered him unqualified to perform his job there. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 9.) Alternatively, the Shipyard contends that even if Blair could establish a prima facie case, he cannot overcome the evidence showing that race or national origin played no role in the discharge of employees who violated its discipline policy. '(*See id.* at 10–11.)

Last, the Shipyard claims that Blair failed to timely file charges with the EEOC and that his allegations concerning light-duty work are therefore time-barred. (*See id.* at 11–15.) The Shipyard notes that even if Blair did meet the time bar, the December 1997 light-duty claim still cannot withstand summary judgment because Blair himself offered a medical certificate asserting that he could perform "regular" duty. (*See id.* at 13–15.)

Blair has responded by submitting a "Rebuttal" document divided into both a memorandum and an affidavit. In the memorandum portion, Blair infers that two months after he began his job, a Shipyard manager said he would "call the INS on me so they could ship me back to Jamaica on a banana boat." (Pl.'s Rebuttal at 1.) He also indicates that on December 1, 1997, his supervisor Eddins called him "a non-talking Jamaican fool" while on April 17, 1998, Eddins allegedly told him "never to take [his] black ass to personnel again." (*Id.*) Like much of the entire document, the Rebuttal also simply concludes that "[t]he defendant reason are false and are just a pretext for discrimination." (*Id.*)

In the affidavit portion, Blair mentions that while the Shipyard may have assigned other minority employees to light-duty work, one of those employees has himself filed discrimination charges against it. (*See id.* at 3.) He revisits the allegation

---

2. Blair also initially claimed discrimination based on disability, but he subsequently abandoned that claim. (*See* Pl.'s Dep. Tr. at 195–96.)

that certain white employees received light-duty work when they suffered injuries, though one of these white employees has denied this unsupported allegation. (Pl.'s Rebuttal at 3; Def.'s Ex. 12.)

Blair also relays a different understanding of the protocol concerning his medical-leave request and discharge, saying that because Shipyard personnel had approved his request before he took leave, he thought he did not have to produce a medical note upon his return. (*See id.*; *see also* Pl.'s Dep. Tr. at 74–76.) He questions why Lucy Metcalf would claim that he needed a medical certificate when "she and two (2) other sing [sic] the approve box on my action notice, without a doctor certificate." (Pl.'s Rebuttal at 2.) Finally, he claims that while white employees "Rick Huntsman" and "the son of Lucy Metcalf (Troy as I known him)" were repeatedly late or absent from work, the Shipyard only disciplined them "step by step" before discharging them. (*Id.* at 2–3.)

Having reviewed both parties' submissions, the Court believes no jury could reasonably find that the Shipyard denied light-duty work in December 1997 or otherwise discharged Blair on account of his race or national origin. In addition, the Shipyard has shown that Blair failed to timely file his four other light-duty claims. The Court therefore finds summary judgment appropriate for every claim that Blair has raised.

## II. *Summary Judgment Standard*

Summary judgment forces plaintiffs to come forward with some minimal facts showing the defendant's potential liability pursuant to the claims alleged. *See* Fed. R.Civ.P. 56(e). In this manner, summary judgment enables courts to prevent "factually unsupported claims and defenses" from proceeding to trial and, in so doing, helps avert "the considerable expense of preparing for and participating in a trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *accord Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Accordingly, a defendant moving for summary judgment only bears the burden of showing that no genuine issue of material fact exists and that it merits judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). And when, like here, the plaintiff maintains the ultimate burden of persuasion at trial, the defendant can meet the burden on its motion by simply identifying the absence of evidence supporting the plaintiff's case. *Catrett*, 477 U.S. at 325, 106 S.Ct. 2548.

If this occurs, the plaintiff cannot merely rest upon the allegations in his complaint, *Catrett*, 477 U.S. at 322–24, 106 S.Ct. 2548, or "simply show ... some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, he must set forth specific facts, through affidavits or other proof, which illustrates a genuine issue for trial. *Catrett*, 477 U.S. at 322–24, 106 S.Ct. 2548. If the plaintiff opposes the motion by affidavit, that affidavit "must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Technologies Applications Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). A memorandum of law or brief will not suffice. *See, e.g., Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 215 (4th Cir.1993).

"The mere existence of a scintilla of evidence in support of the plaintiff's position," moreover, will not defeat summary judgment; rather, "there must be evidence on which a jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505; *accord Barnett v. Tech. Int'l, Inc.*, 1 F.Supp.2d 572, 575 (E.D.Va.1998). Thus, if the plaintiff "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then "the plain language of Rule 56(c)

mandates the entry of summary judgment." *Catrett,* 477 U.S. at 323, 106 S.Ct. 2548; *accord Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Applying these principles, the Court will first discuss the merits of Blair's claims as they relate to his discharge and the denial of his light-duty request in December of 1997. It then will discuss the statutory time bar and how it applies to all of Blair's light-duty claims.

### III. *Discussion*

#### A. *Blair's Discharge*

Unlike summary judgment, the courts have applied different standards in evaluating discrimination claims like Blair's. Regardless, the evidence of record here does not satisfy any of those standards.

Under Title VII of the 1964 Civil Rights Act, an employee can seek redress for an adverse employment decision if he can prove that "but for" his employer's discriminatory intent, that adverse decision would not have occurred. *See EEOC v. Clay Printing,* 955 F.2d 936, 940 (4th Cir. 1992); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (liability in discrimination case "depends on whether the protected trait . . . actually motivated the employer's decision"). An employee can prove this through either direct evidence of an employer's discriminatory intent or through the proof scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Karpel v. Inova Health Sys. Serv.,* 134 F.3d 1222, 1227–28 (4th Cir.1998).

The Fourth Circuit has used slightly different factors under the *McDonnell Douglas* scheme when a discrimination claim involves the employee's discharge. One line of cases has held that to establish a prima facie case and thereby create an inference of race discrimination, an employee must demonstrate that: (1) he belongs to a racial minority or other group protected by Title VII; (2) he was qualified for his job and performed his job satisfactorily; (3) in spite of his qualifications and job performance, his employer discharged him; and (4) his job "remained open to similarly qualified applicants after" his dismissal. *See Karpel,* 134 F.3d at 1228 (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 455 (4th Cir.1989)).

■ Under another line of cases, an employee can establish a prima facie case of discriminatory discharge by showing that: (1) he belongs to a racial minority; (2) he engaged in "conduct comparable to employees" not protected by Title VII; and (3) the employer did not terminate "similarly situated employees outside the protected class." *Spratley v. Hampton City Fire Dept.,* 933 F.Supp. 535, 540 (E.D.Va. 1996) (citing *Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir.1993)); *accord Moore v. City of Charlotte,* 754 F.2d 1100, 1105–07 (4th Cir.1985) (interpreting, among other authorities,*McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 note 11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)). "Comparable" conduct by "similarly situated employees" means courts should only compare "the gravity of offenses [committed by the plaintiff and the white employees who were not discharged] on a relative scale." *See Moore,* 754 F.2d at 1107. This is so because Title VII does not require "precise equivalence in culpability between employees" to avoid the inference that race or other protected traits led to the employee's discharge. *See id.; see also Spratley,* 933 F.Supp. at 540.

While the prima facie tests differ, the case law agrees that even if a plaintiff satisfies one of these tests, his claims do not necessarily survive a summary judgment motion or otherwise proceed to trial. *See, e.g., Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241 note 12 (4th Cir. 1982); *Edwards v. Norfolk Southern Corp.,* 872 F.Supp. 277, 280 (W.D.Va.1994). Rather, once an employee establishes a prima facie case, the burden of production shifts to the defendant employer who can rebut this prima facie showing by presenting admissible evidence of a legitimate, non-discriminatory reason for the plain-

tiff's discharge. *See Spratley*, 933 F.Supp. at 540.

To ultimately prevail, the employee must then show that the employer's proffered reason was not the "true reason for his [termination], but that race was." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Thus, while the burden of persuasion remains with the employee at all times, he can still recover under Title VII by showing that a "discriminatory reason motivated the employer or by showing that the proffered reason is pretextual." *Spratley*, 933 F.Supp. at 540 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

In this case, Blair has failed to establish a prima facie case under the direct method of proof or under either of the pretext discrimination tests. Under the direct method, the record contains no evidence of a stated purpose to discriminate except for Blair's eleventh-hour mention of derogatory remarks that Shipyard supervisors allegedly made. Further, the Court cannot even consider these alleged remarks because Blair set them out in a rebuttal brief instead of the affidavit required by Fed. R.Civ.P. 56(e). *See Evans*, 80 F.3d at 962; *Hayes*, 10 F.3d at 215.

■ Additionally, even if the "heightened solicitude" that *pro se* plaintiffs normally receive extends to the affidavit required by summary judgment, *see Zakeri v. Oliver*, 19 F.Supp.2d 553, 556–57 (E.D.Va.1998), these derogatory remarks still would not revive Blair's claims. The statement that the "INS ... could ship [Blair] back on a banana boat" occurred two years before the Shipyard discharged him. And the remarks referring to Blair as "a non-talking Jamaican fool" and threatening him "never to take [his] black ass to personnel again," occurred approximately eight months and three months, respectively, before his termination. *Compare Hazen Paper Co.*, 507 U.S. at 612–13, 113 S.Ct. 1701 (direct evidence of discrimination did not warrant remand when it

only included "two isolated comments by the" employer). Given that the Shipyard discharged Blair immediately after it discovered his discipline violations, and given the lapse in time between these alleged remarks and Blair's discharge as well as the absence of any other direct evidence, no jury could reasonably find that these remarks, while deplorable, amounted to anything other than "isolated comments." *See id.; see also Clay Printing*, 955 F.2d at 940.

■ Nor has Blair established a prima facie case under either of the pretext schemes. First, under the four-prong scheme used in *McDonnell Douglas* and *Karpel, supra*, Blair cannot show that he satisfactorily performed his job. The evidence establishes that Blair violated Shipyard policy by failing to present a doctor's note to document his medical leave and by giving information that Shipyard personnel reasonably believed was false. Further, the Shipyard emphasized that it would not tolerate violations of its absenteeism policy. And when the Shipyard learned that Blair had not taken medical leave to see a doctor or have other medical tests performed, it simply adhered to its discipline policy by suspending and ultimately discharging Blair. Accordingly, since Blair violated policies that the Shipyard considered "very important," he did not perform his job satisfactorily and cannot establish a prima facie case of race discrimination. *Compare Karpel*, 134 F.3d at 1228 (employee alleging race motivated her discharge could not satisfy prima facie burden or survive summary judgment when record showed, among other violations, that she "was repeatedly tardy").

■ And under the three-prong prima facie scheme described in *Cook, Moore*, and *Spratley, supra*, Blair cannot show that the Shipyard punished him any differently than "similarly situated" white employees. Again, the discipline policy indicates that unexcused absences and falsified information could result in termination. The Shipyard followed that policy not only

when it discharged Blair, but also when it discharged a white American employee who similarly took an unexcused absence and falsified information. *See Moore,* 754 F.2d at 1107; *Spratley,* 933 F.Supp. at 540. And as with Blair, this white employee did not receive "step by step" discipline but was instead terminated immediately. *See id.*

Further, Blair cannot compare himself to white employees "Rick Huntsman" or Lucy Metcalf's son "Troy" because, unlike Blair, those employees only violated the Shipyard's attendance policy: nothing shows that they also provided false information or falsified records. *See id.; see also Karpel,* 134 F.3d at 1228 (unlike white employees who committed one or two violations, plaintiff's "conglomeration" of workplace violations rendered her unfit to perform job and unable to satisfy prima facie burden). Indeed, the Shipyard discipline policy made clear that attendance violators—a level-one offense—would first receive warnings before facing termination, while employees who provided false information—a level-three offense—faced immediate termination. Therefore, because the Shipyard consistently applied its own policy, Blair cannot reasonably assert that Shipyard discipline turned on an employee's race or national origin. *Compare Spratley,* 933 F.Supp. at 540–41 (plaintiff alleging race motivated discharge failed to establish prima facie case and overcome summary judgment when evidence showed discharge resulted from his "long-term absence from work" and concomitant failure to justify his absence with medical evidence, and other white employees' misconduct "did not affect the functioning of" the workplace like plaintiff's absence did).

■ Finally, Blair could not rebut the evidence showing his discharge rested on legitimate, nondiscriminatory grounds even if he could establish a prima facie case. Again, the evidence indicates that the Shipyard's discipline policy covered absenteeism and falsified information, that these offenses could lead to termination, that Blair violated these policies, and that

the Shipyard had immediately terminated a white American employee for committing similar offenses. Further, Blair's rebuttal evidence only confirms that the Shipyard punished lesser offenses with less severe sanctions and within the dictates of its discipline policy. Based on this record, no jury could reasonably find that the Shipyard used Blair's violations as a mere pretext for race or national origin discrimination. *See Spratley,* 933 F.Supp. at 541–42; *see also Edwards,* 872 F.Supp. at 281.

To conclude, the Court does not discount the possibility that Blair's discharge resulted from a simple misunderstanding. Blair may legitimately believe that he did not have to produce a doctor's certificate to justify his absence. But the Court's role is confined to deciding whether race or national origin led to his dismissal, not whether the Shipyard correctly applied its own policies. *Cf. St. Mary's Honor Ctr.,* 509 U.S. at 508, 511, 514, 113 S.Ct. 2742 (courts only role is to determine whether a protected trait motivated adverse employment decision, not whether employer offered correct or genuine reasons for that decision). Consistent with its limited role, the Court believes that Blair's discharge claim can go no further.

### B. *Denial of Light–Duty Work in December 1997*

■ Blair's claim involving light-duty work in December of 1997 suffers from similar defects. To establish a prima facie case of race discrimination in the denial of a light-duty assignment, a plaintiff must show that (1) he suffered an injury; and (2) similarly injured employees of a different race received light-duty assignments. *See White v. Fed. Express Corp.,* 729 F.Supp. 1536, 1554 note 29 (E.D.Va.1990) (citing *McDonnell Douglas* and *Moore, supra* ), *aff'd,* 939 F.2d 157 (4th Cir.1991). If he meets this burden then the usual pretext framework, in which the employer articulates a legitimate reason for its decision and the plaintiff attempts to show that this reason represents a mere pretext for

race discrimination, applies. *See id.; see also St. Mary's Honor Ctr.,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Spratley,* 933 F.Supp. at 540.

Here, Blair himself has offered evidence that undermines his attempt to establish a prima facie case. Of the two medical certificates he presented to the Shipyard in December of 1997, one asserts that Blair had "recovered sufficiently . . . to return to regular work duties." Additionally, while Blair mentions in his complaint that other white employees suffered injuries and received light-duty work, he has not proffered any evidence to support these allegations. *See Catrett,* 477 U.S. at 322–24, 106 S.Ct. 2548 (plaintiff facing summary judgment motion cannot rest upon mere allegations in his complaint). To the contrary, one of the injured white employees who Blair identified in his complaint has averred that he "did not ask for and did not receive light-duty work." (*See* Def.'s Ex. 12.)

■ Accordingly, since Blair's own evidence indicates that he did not have an injury at the time he applied for light-duty work, and since he has failed to offer any evidence showing that white employees did in fact apply for and receive light-duty work, he has also failed to establish a prima facie case of discrimination based on the denial of his light-duty request in December of 1997. *See, e.g., White v. Fed. Express Corp.,* 729 F.Supp. at 1554 note 29.

And even if Blair could establish a prima facie case for this light-duty claim, he has done nothing to rebut the evidence showing that the Shipyard has, in fact, assigned minority workers to light-duty assignments. *See id.; see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Spratley,* 933 F.Supp. at 540. His affidavit's assertion that one of these minority workers filed a discrimination charge against the Shipyard is simply irrelevant: the assertion infers that discrimination infected Shipyard light-duty deci-

sions about as much as it infers that the Shipyard had the misfortune of hiring employees who wily-nilly filed lawsuits against it. Neither inference bears on whether the Shipyard assigned light-duty work on the basis of race or national origin. *See id.; see also Evans,* 80 F.3d at 962 (summary judgment affidavit must present relevant evidence, "as if the affiant were testifying in court"). Instead, the only cognizable evidence before the Court shows the Shipyard assigned light-duty work exactly as it said it did: "on a case-by-case basis" depending on "the facts of the situation involved with that employee." No rational fact finder could infer more.

C. *The Statutory Time Bar and the Continuing Violation Theory*

Though the discussion above disposes of Blair's December 1997 claim, the Shipyard has argued that, in the alternative, this claim also failed to satisfy the time bar applicable to civil rights claims. As noted earlier, the Shipyard further contends that the time bar eliminates Blair's four remaining light-duty claims. The Court agrees with the latter argument but disagrees with the former.

Under 42 U.S.C. § 2000e–5(e), a civil rights claimant must file charges with the EEOC before filing a complaint in federal court. Generally, he must file those charges 180 days after the alleged discriminatory act or decision occurred. *Id.; Demuren v. Old Dominion Univ.,* 33 F.Supp.2d 469, 476 (E.D.Va.1999). If he fails to meet the time bar, his federal complaint is generally precluded. *Id.*

■ If the state in which he files, however, has a "state deferral agency" that will address his charges, the employee will have up to 300 days to file with the EEOC. *See id.; Zakeri,* 19 F.Supp.2d at 557. Virginia has such an agency, the Virginia Council on Human Rights ("VCHR"). *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 437, 442 (4th Cir.1998). If the employee first files charges with the VCHR, federal law mandates that the

VCHR have sixty (60) days to investigate the discrimination charges before referring them back to the EEOC. 42 U.S.C. § 2000e–5(c); *Zakeri,* 19 F.Supp.2d at 557. Further, if the employee first attempts to file with the EEOC, the EEOC must still refer the charges to the VCHR and grant it the same sixty (60) days to investigate.[3] *Id.;* 29 C.F.R. § 1601.13 (1998).

Based only on these principles, it appears at first glance that even though the VCHR qualifies as a state deferral agency, and even though the 300–day bar therefore applies, all of Blair's light-duty claims except for the December 1997 one are time-barred. *See* 42 U.S.C. § 2000e–5(e); *Tinsley,* 155 F.3d at 442; *Demuren,* 33 F.Supp.2d at 476; *Zakeri,* 19 F.Supp.2d at 557; *see also Bolt v. Norfolk Southern Corp.,* 22 F.Supp.2d 512, 515–16 (E.D.Va. 1997). This finding ultimately proves correct but for reasons more complicated than the Shipyard's motion suggests. The Court will discuss the December 1997 claim first and the remaining light-duty claims thereafter.

First, the Shipyard cannot alternatively prevail on the theory that Blair failed to timely file his claim concerning the denial of light-duty work in December of 1997. The Shipyard indicates that it denied Blair's light-duty request on December 22, 1997. Since this District has repeatedly held that the existence of the VCHR triggers the more generous 300–day filing period, Blair therefore had until October 21, 1998, to file charges related to the denial of his request. *See Demuren,* 33 F.Supp.2d at 476; *Bolt,* 22 F.Supp.2d at 515–16; *Zakeri,* 19 F.Supp.2d at 557. Blair, according to the Shipyard's motion,

filed his charges on October 9, 1998, twelve (12) days before it was due. *See id.*

The Shipyard attempts to short-circuit this finding by arguing that Blair never filed a claim with the VCHR, and that he therefore had to abide by the 180–day filing period. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 12.) Its argument—but not its evidence—gathers support from *Meyer v. Bell Atlantic Network Serv., Inc.,* —— F.Supp.2d ——, 1999 WL 149777 (E.D.Va. Feb.16, 1999). There, the court held that a civil rights plaintiff who only filed charges with the EEOC, and never with the Virginia Commission of Human Rights, had to do so within 180 days. *Id.* at \*3–4, ——–——. Interpreting both the text and legislative history behind 42 U.S.C. § 2000e–5(e)(1) as well as Supreme Court precedent, the court concluded that the statutory time bar " 'was not designed to give an [employee] in a deferral State the option of choosing between his state remedy and federal remedy, nor indeed simply to allow him additional time in which to obtain state relief.' " *Id.* at \*3, —— (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 821, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)).

This Court need not pass on whether the *Meyer* decision correctly interpreted 42 U.S.C. § 2000e–5(e)(1) or whether *Meyer* alters or conflicts with this District's holdings in *Demuren, Bolt, Zakeri, supra.* Unlike the situation in *Meyer,* the document charging the Shipyard with discrimination indicates that Blair may have indeed availed himself of the VCHR, as evidenced by the document heading entitled "Virginia Council On Human Rights."

---

**3.** In any event, because the EEOC must receive the charges within 300 days regardless of what agency first received them, civil rights claimants should strive to have their claims filed with the EEOC no later than 240 days after the discriminatory act occurred. *See Zakeri,* 19 F.Supp.2d at 557. This is so because if, for example, a claimant filed charges with the EEOC 241 days after the discrimination occurred, the EEOC would have to refer the charges to the VCHR and grant it the sixty-day deferral period. By waiting until

the 241st day, however, the claimant would risk having the VCHR take the full sixty (60) days to investigate, meaning the EEOC would not get the charges until the 301st day. As a result, the EEOC technically would not have received the charges until after the 300–day filing period had expired, in violation of 42 U.S.C. § 2000e–5(e). This in turn would bar the claimant from subsequently filing a complaint in federal court. *Demuren,* 33 F.Supp.2d at 476 note 7; *Zakeri,* 19 F.Supp.2d at 557.

(*See* Def.'s Ex. 11.) And he may have even tried to "appeal" a VCHR decision by sending a letter to the Virginia Employment Commission. (*See* Def.'s Ex. 7.) The Court thus finds that the Shipyard has not properly supported this argument and that it therefore cannot liken Blair's December 1997 claim to the time-barred claim in *Meyers*. Accordingly, the Court must presume that for purposes of summary judgment, the 300–day filing period did apply here and that Blair did meet it. *See Demuren, Bolt, Zakeri, supra.*

Second, though the Court agrees with the Shipyard and finds that Blair's remaining 1996 and 1997 light-duty claims are time-barred, it does so ·with the added understanding that Blair cannot save them via the continuing violation theory. To begin with, these claims do indeed succumb to even the 300–day filing deadline. Nothing in the record pinpoints when the denial of the June 1996 and August 1996 light-duty requests actually occurred. But even assuming the denials took place at the end of each month mentioned, the latest Blair could have possibly filed these two claims would have been May 1, 1997, and July 1, 1997, respectively—or roughly fifteen (15) months before October 9, 1998, when Blair actually filed them. *See Demuren, Bolt, Zakeri, supra.* Making the same assumption with Blair's July 1997 and September 1997 light-duty claims, the latest Blair could have filed these would have been May 1, 1998, and August 1, 1998, respectively—or roughly two to five months before Blair actually filed them. *See id.*

The last issue, therefore, turns on whether the statutory time bar still eliminates these claims despite the application of the continuing violation theory. Neither party has briefed or even alluded to this theory but, in the interests of affording a *pro se* plaintiff "heightened solicitude" and of promoting judicial economy should Blair raise the matter on appeal, the Court will *sua sponte* conduct this analysis. *See Zakeri*, 19 F.Supp.2d at 556–57.

■ The continuing violation theory may resurrect discrimination claims that otherwise appear time-barred. *See, e.g., Bolt*, 22 F.Supp.2d at 516–17. To do so, the claimant must show that the discriminatory incidents falling outside the statutory period bear some relation or similarity to a discriminatory incident falling inside the statutory period. *See id.* (citing *Williams v. Enterprise Leasing Co. of Norfolk/Richmond*, 911 F.Supp. 988, 996 (E.D.Va.1995)). "As a threshold matter, the theory will not apply unless" a present violation within the relevant time period exists. *See McCorkle v. Veda, Inc.*, 1998 WL 393709, *2 (4th Cir.1998).

■ Further, courts addressing the continuing violation theory must consider (1) whether the untimely claims involve the same type of discrimination as the timely claims; (2) whether the acts described in the timely and untimely claims occurred frequently; and (3) whether the untimely claims involve discrimination that would "have a degree of permanence which would trigger an employee's awareness and duty to assert his or her rights." *See Demuren*, 33 F.Supp.2d at 477 (quoting *Enterprise Leasing Co.*, 911 F.Supp. at 996); *accord Bolt*, 22 F.Supp.2d at 516. In short, if the claims involve similar discriminatory acts, these acts occurred frequently, and the claimant still could not have reasonably known of his duty to enlist the aid of the EEOC or other agency by filing a claim, the continuing violation theory will allow federal courts to consider the merits of the untimely claim. *See id.* All three conditions, however, plus the "threshold matter" mentioned above, must be fulfilled. *See Demuren*, 33 F.Supp.2d at 477–78; *Bolt*, 22 F.Supp.2d at 516.

■ Blair cannot meet all of these conditions. First, he can hardly say that these alleged acts occurred frequently. *See id.* Approximately one year separates the 1996 light-duty incidents from the 1997 incidents, and another two or three months separates the September 1997 incident from the December 1997 claim. *See id.*

Moreover, Blair's own complaint and rebuttal affidavit evince an early awareness of his duty to file claims based on these alleged acts. *See id.* Specifically, his affidavit indicates that employees "staarted [sic] to complain" when white employees allegedly received favorable treatment. *Compare Demuren,* 33 F.Supp.2d at 477–78 (continuing violation theory did not save untimely claims when letters and complaints showed that plaintiff had earlier complained about discrimination); *Bolt,* 22 F.Supp.2d at 516 (theory did not save claims involving acts outside relevant time period when plaintiff had complained to his supervisors about the discriminatory acts). And his complaint notes that he "tried to resolve these [discrimination] problems but [his] efforts [proved] futile." *Compare id.* Accordingly, since the record also indicates that Blair knew or should have realized earlier that he had to file charges based on these alleged acts, the continuing violation theory is inapplicable here.[4]

In sum, the Court finds that while Blair timely filed the claim concerning light-duty work in December of 1997, that claim cannot resuscitate the untimely claims arising from the alleged events of 1996 or July and September of 1997. Therefore, the Court concludes that these untimely claims cannot withstand the statutory time bar. For these reasons, and for the reasons discussed earlier, the Court must dismiss Blair's discriminatory discharge and December 1997 light-duty claims on the merits, and his remaining light-duty claims as time-barred.

### ORDER

For the reasons stated above, the Court GRANTS the defendant's summary judgment motion and ORDERS plaintiff's claims DISMISSED.

---

**4.** In *White v. Fed. Ex. Corp.,* 729 F.Supp. 1536, 1550–51 (E.D.Va.1990), the court held that the "continuing violation rule" enabled a claimant to overcome the time bar and have his untimely light-duty discharge claims addressed on the merits. The court there determined that the claimant's discharge served as "the final act in the continuing course of alleged actionable conduct" and therefore swept "the prior discriminatory acts within the limitations period." *Id.* at 1551. Since the time of the *White* decision, the Fourth Circuit and this District have refined the continuing violation theory and, as a result, this Court questions the viability of *White* in light of these refinements. Further, the Court notes that *White* appears distinguishable from the instant case in that the alleged acts here occurred infrequently and thus do not resemble the "pattern" of events described in that case. *Contrast* 729 F.Supp. at 1550–51.